**ARLINGTON COALITION ON TRANSPORTATION et al., Appellants,**

v.

**John A. VOLPE, Secretary of Transportation, et al., Appellees.**

**No. 71–2109.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 6, 1972.

Decided April 4, 1972.

As Modified May 9, 1972.

Lawrence J. Latto, Washingon, D. C. (Donald S. Burris, Hardy L. Wieting, Jr., and Shea & Gardner, Washington, D. C., on brief), for appellants.

Robert S. Lynch, Atty., Dept. of Justice (Shiro Kashiwa, Asst. Atty. Gen., and Edmund B. Clark, Atty., Dept. of Justice, and Brian P. Gettings, U. S. Atty., James R. Tate, Asst. U. S. Atty., and Dowell H. Anders, Washington, D. C., Deputy Chief Counsel, Federal Highway Administration, on brief), for federal appellees.

Stuart H. Dunn, Asst. Atty. Gen. of Va. (Andrew P. Miller, Atty. Gen., and Vann H. Lefcoe, Asst. Atty. Gen., on brief), for appellee Douglas B. Fugate, Commissioner.

Arthur B. Vieregg, Jr., Fairfax, Va., on brief for appellee, Fairfax County Chamber of Commerce, Inc.

Robert Funicello, Washington, D. C., on brief for amicus curiae, The Wilderness Society.

Before CRAVEN and BUTZNER, Circuit Judges, and YOUNG, District Judge.

CRAVEN, Circuit Judge:

This is an ecology case. It is the declared public policy of the United States to protect and preserve the national environment "to the fullest extent possible." National Environmental Policy Act of 1969, 42 U.S.C.A. § 4332 (NEPA). The NEPA is a value judgment by the Congress that in order to "foster and promote the general welfare" each generation of Americans must, beginning now, act "as trustee of the environment for succeeding generations." 42 U.S.C.A. § 4331. We hold that even essential highway construction must yield to the congressionally structured priority.

Appellants are individuals who live in Arlington and own land in the path of the proposed highway, and associations whose objectives are the preservation of environmental and community values and the development of a sound transportation system in the Washington metropolitan area. Appellees are the Secretary of the United States Department of Transportation, the Commissioner of the Virginia Department of Highways, and

their agents. Intervening appellees are the Arlington and Fairfax Counties Chambers of Commerce. Appellants filed suit in February 1971, seeking a declaration that in the planning of the segment of Interstate Route 66 (I–66) scheduled to run through Arlington County, Virginia, appellees violated certain federal statutes, and an injunction restraining appellees from proceeding with the planning and construction of this part of I–66. The district court refused relief, 332 F.Supp 1218, and this appeal resulted.

On November 24, 1971, we granted appellants' request for an injunction pending appeal. State appellee Fugate and his agents were enjoined "from condemning additional land for . . . Interstate–66 located in Arlington County, Virginia, and from requiring the appellants . . . to vacate their properties in the county." Federal appellee Volpe and his agents were enjoined "from approving, pursuant to 23 U.S.C. § 106(a), plans, surveys, specifications and estimates for . . . Interstate–66 located in Arlington County, Virginia."

We conclude that the federal statutes invoked by appellants are applicable to Arlington I–66 and must be complied with before further steps may be taken towards construction of this highway. Compliance means not only reconsideration of the proposed location of Arlington I–66 in the light of environmental, social, and economic policies set forth in the statutes; it means also suspension of work on Arlington I–66 pending this reconsideration. Further investment of resources by appellees in the proposed route would render alteration or abandonment of the proposed route increasingly costly and, therefore, increasingly unwise. If appellees were thus allowed to limit their options during their reconsideration of the location of Arlington I–66, reconsideration would be a hollow gesture. See Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 449 F.2d 1109, 1128 (D.C.Cir.1971). We reverse the decision of the district court and remand this case for entry of an order enjoining further steps towards the construction and acquisition of right-of-way for Arlington I–66 pending reconsideration of the proposed location of this highway in accordance with the applicable statutes. Upon entry of such order, our injunction of November 24, 1971, will expire.

## I. FACTUAL BACKGROUND

Interstate–66 is scheduled to extend from I–81, near Strasburg, Virginia, over 75 miles to the Potomac River in Arlington County. The section in controversy begins at the Arlington County line, after the highway has passed through Fairfax County from the Washington Beltway, and ends at the Theodore Roosevelt Bridge. For the route of I–66 through Arlington, appellees intend to use 9.6 acres of Bon Air Park and about 5 acres of Spout Run Parkway. Bon Air Park is a tract of land acquired by Arlington County for park and highway purposes and presently used for a park. Spout Run Parkway is a park owned by the federal government and administered by the National Park Service. It is planned that I–66 will be connected in Spout Run Parkway to another proposed interstate highway, I–266, with a bridge to be constructed across the Potomac at a point called "Three Sisters." Whether and where I–266 and the Three Sisters Bridge should be built have been the subject of considerable public controversy and litigation. See D. C. Federation of Civil Associations v. Volpe, 140 U.S.App.D.C. 162, 434 F.2d 436 (1970); D. C. Federation of Civic Associations v. Volpe, 459 F.2d 1231 (D.C. Cir. 1971). If the proposed I–266 route to the Three Sisters Bridge is built, the 31.6 acres of Spout Run Parkway will be conveyed to the Virginia Department of Highways in exchange for funds to acquire the same number of acres along George Washington Parkway, and 13.97 acres of Spout Run Parkway will be used for I–266. After emerging from Spout Run Parkway, I–66 is scheduled to con-

verge with Lee Highway for about one mile until it reaches the Potomac. Lee Highway, currently a three-to-four-lane road, will be separated at this point by the six lanes of I–66 into four eastbound lanes south of I–66 and four westbound lanes north of I–66, so that for about one mile there will be a fourteen-lane road.

Before a highway may be constructed with 90 percent federal funds as a part of the Federal Interstate System, the procedure set out by the Federal-Aid Highway Act, 23 U.S.C.A. § 101 et seq., must be followed. First, a route must be selected by the highway department of a state and approved by the Secretary of Transportation. 23 U.S.C.A. § 103 (d) & (e) (1). Next, the state highway department must submit to the Secretary for his approval a "program . . . of proposed projects" that the state wishes to construct with its portion of the funds appropriated for highway construction. 23 U.S.C.A. § 105(a). Then, the state highway department must submit to the Secretary for approval "such surveys, plans, specifications, and estimates for each proposed project included in an approved program as the Secretary may require." 23 U.S.C.A. § 106(a). This is known as "P. S. & E. approval." As a prerequisite to P. S. & E. approval for each "project," the state highway department must certify to the Secretary that it has held public hearings on the location for each project and must submit a transcript of the hearings to the Secretary. 23 U.S.C.A. § 128. Following P. S. & E. approval, project agreements covering construction and maintenance are entered into between the Secretary and the state highway department. 23 U.S.C.A. § 110. Advertisements for bids may then be published and construction contracts awarded. Finally the highway is constructed under the supervision of the state highway department. 23 U.S.C.A. §§ 112, 114.

The next step towards the construction of the Arlington County "project" of I–66 appears to be P. S. & E. approval. The public hearing relating to the location of this project was held in October 1958. In February 1959, the Virginia State Highway Commission chose the Fairfax-Bluemont Drive corridor as the location for Arlington I–66, and their recommendation was approved by the Federal Bureau of Public Roads in June 1959. This process was given extensive newspaper coverage. The route selected has been shown in the Arlington County General Land Use Plan since 1961. Arlington County has relied upon the proposed route in its zoning, traffic, and utilities location planning, and numerous businesses have located near the proposed route. By January 11, 1965, acquisition of the right-of-way for the entire Arlington I–66 project had been approved, and by July 28, 1966, acquisition-of-right-of-way agreements between the state highway department and the Secretary had been entered into for the entire project. In the proposed corridor, 93.9 percent of all dwellings have been acquired; 98.5 percent of all businesses have been acquired; 75.6 percent of all families have been relocated; 84.6 percent of all businesses have been relocated; and 84.4 percent of all necessary right-of-way has been acquired. The cost of these acquisitions, for which the state has been reimbursed pursuant to the acquisition agreements, was $28,670,123.07. The estimated cost to complete the acquisition of right-of-way is $5,329,876.93. The Commonwealth of Virginia has expended $1,500,000 in preliminary engineering which will not be reimbursed by the federal government. In short, most planning and preliminary work has been done. Most of what remains to be done is actual construction, which has scarcely begun: a 0.298-mile approach to the Theodore Roosevelt Bridge, miscellaneous construction work on the bridge, and a 10-foot-by-10-foot box culvert under Lee Highway near Kirkwood Road. A series of on-site inspections of the Arlington I–66 route was conducted between 1961 and 1968 by state and federal officials. During these inspections, plans for the design of the highway were compared with actual con-

ditions for the purpose of finalizing plans to be submitted to the Secretary for approval.

## II. JURISDICTION AND LACHES

■ Before turning to appellants' claims, we dispose of two obstacles put in their path by appellees. First, Appellee Fugate, Commissioner of the Virginia Department of Highways, claims that he is not subject to federal jurisdiction. Because the challenged activities of his department—condemnation of right-of-way and eviction of the landowners—are authorized by state law and could be carried out independently of the Arlington I-66 project, he claims that no federal question exists with respect to these activities. 28 U.S.C.A. § 1331(a). We disagree, because these activities would not in fact be independent of this project. See Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013, 1028 (5th Cir. 1971); Morningside-Lenox Park Association v. Volpe, 334 F.Supp. 132, 146 (N.D.Ga.1971). Appellee Fugate does not suggest that the Commonwealth of Virginia no longer seeks to build this highway with federal funds. If we were to find—as we do—that federal law requires that the proposed route for Arlington I-66 be reconsidered, acquisition by the state of right-of-way along the proposed route during the reconsideration would make proceeding with the proposed route increasingly easier and, therefore, a decision to alter or abandon the route increasingly undesirable. Thus the challenged activities of the state highway department would make a sham of the reconsideration required by federal law.[1] Action of a state highway department, challenged because furthering a project that under federal law allegedly must be reconsidered, is a matter in controversy arising under the laws of the United States. Federal jurisdiction over such state action is essential to preserve federal question jurisdiction in the application of federal statutes. It is a form of pendent jurisdiction, but based upon necessity rather than convenience and limited to preventing emasculation of remedy clearly available against the federal respondents.

■ Secondly, appellees claim that appellants' suit should be barred by laches. Appellees as representatives of the general public and specific interest groups will be prejudiced by appellants' delay in bringing suit if the proposed route for Arlington I-66 is altered or abandoned. Most of the right-of-way for the proposed route has been acquired; Arlington County's planning with respect to zoning, traffic, and location of utilities has been based upon the route; and the location of numerous businesses has been chosen in reliance upon the route. Appellants could have brought suit earlier to minimize or avoid this harm; all of the relevant statutes were in effect by January 1, 1970, but appellants did not file suit until February 19, 1971. Nevertheless, we decline to invoke laches against appellants because of the public interest status accorded ecology preservation by the Congress.[2] We believe that

1. In Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971), the court declined to enjoin state officials from proceeding with a federally funded project covered by the NEPA. In that case, however, the problem of the effect of the state's action on federal law was not before the court.

2. In Lathan v. Volpe, 455 F.2d 1111 (9th Cir.1971), the court held that laches precluded a challenge to the validity of a hearing on the location of an interstate highway. The hearing in that case was challenged because it was allegedly procedurally defective. In our case appellants complain because *no* hearing was held on certain effects of the proposed route for Arlington I-66. See Part V. The public, we think has a greater interest in the outcome of the present suit. Furthermore, there is no indication in Lathan that the public's stake in the suit was considered at all. In Triangle Improvement Council v. Ritchie, 314 F.Supp. 20 (S.D.W.Va.1969), aff'd 429 F.2d 423 (4th Cir. 1970) (per curiam decision), cert. dismissed, 402 U.S. 497, 91 S.Ct. 1650, 29 L.Ed.2d 61 (1971), laches was held to bar a suit challenging the validity of a hearing on the location of a highway.

Arlington I–66 has not progressed to the point where the costs of altering or abandoning the proposed route would *certainly* outweigh the benefits that might accrue therefrom to the general public. In their reconsideration of the proposed route, the Secretary of Transportation and the Commissioner of the Virginia Department of Highways may decide, of course, that the costs do outweigh the benefits. If the opposite conclusion is a reasonable possibility, however, as it is here, the congressional declaration of policy in the relevant statutes of the importance of the benefits that might accrue demands that the merits of the question be considered by the appropriate agencies.

## III. SECTION 102 OF THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969

■ We hold that the federal appellees must file and consider an environmental impact statement in accordance with Section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. § 4332(C)) before taking further steps towards the construction of Arlington I–66. Section 102(C) reads as follows:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternative to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

It is undisputed that prior to the filing of this suit no Section 102(C) statement had been prepared for the project in question. It is also uncontested that this six-to-eight-lane highway is a "major Federal action significantly affecting the quality of the human environment." Appellees claim, however, that Section 102(C) is not applicable to Arlington I–66 because this project was in progress prior to January 1, 1970, the effective date of the Act. Arlington I–66, however, was and is a project ongoing *after* the effective date of the Act. We believe that applying Section

---

The basis of the complaint is not stated in the opinion. The court believed that the complaint was without merit, however, and presumably concluded that the public interest would not be served by the suit. As discussed in Part V, we believe that the complaint in our case is valid.

102 to Arlington I–66 would not violate the rule invoked in Brooks v. Volpe, 319 F.Supp. 90 (W.D.Wash.1970), that a statute does not have retroactive effect absent a clear indication that Congress so intended. For reasons subsequently stated, we think applying Section 102 (C) to this highway would simply not be a retroactive application of the Act. See Named Individual Members of the San Antonio Conservation Society, *supra*, 446 F.2d at 1025.

■ Doubtless Congress did not intend that all projects ongoing at the effective date of the Act be subject to the requirements of Section 102. At some stage of progress, the costs of altering or abandoning the project could so definitely outweigh whatever benefits that might accrue therefrom that it might no longer be "possible" to change the project in accordance with Section 102. At some stage, federal action may be so "complete" that applying the Act could be considered a "retroactive" application not intended by the Congress. The congressional command that the Act be complied with "to the fullest extent possible" means, we believe, that an ongoing project was intended to be subject to Section 102 until it has reached that stage of completion, and that doubt about whether the critical stage has been reached must be resolved in favor of applicability.

> We must stress as forcefully as possible that this language does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow "discretionary." Congress did not intend the Act to be such a paper tiger. Indeed, the requirement of environmental consideration "to the fullest extent possible" sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts.

Calvert Cliffs' Coordinating Committee, *supra*, 449 F.2d at 1114. See also Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971); Morningside-Lenox Park Association, *supra*; Environmental Defense Fund, Inc. v. Corps of Engineers, 324 F.Supp. 878 (D.D.C.1971). The cases refusing to apply Section 102(C) "retroactively" to projects ongoing at the effective date of the Act are not inconsistent with this principle because in those cases the factor determining the applicability of Section 102(C) appears to have been the stage of completion of the project. In Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038, 1039 (D.Or.1970), the district court stated,

> I cannot believe that Congress intended that the NEPA apply to "major Federal actions" which had reached this stage of completion as of the date of enactment. It was not the intention of Congress to negate all of the work which had gone into this project, including design and planning costs, but to have it completed in an orderly manner.

In Pennsylvania Environmental Council, Inc. v. Bartlett, 454 F.2d 613 (3rd Cir. 1971),

> The Secretary's action approving Pennsylvania's application took place on November 20, 1969, and construction contracts were awarded on December 29, 1969. The only duty remaining on the Secretary after November 20, 1969 was to make a final inspection of the project after construction. 23 U.S.C. § 117(c). For all practical purposes, therefore, final federal action on the project took place prior to January 1, 1970, the effective date of NEPA. There is no evidence of a congressional intention that the act be applied retroactively to reopen decisions which had become final before that date. . . . This is not a case where discretionary federal administrative action takes place in stages, and some stages have taken place prior to January 1, 1970 while others remain.

In Elliott v. Volpe, 328 F.Supp. 831 (D. Mass.1971), construction contracts had been awarded and actual construction had begun.

We cannot, of course, define for all cases the point of completion beyond which Section 102(C) is no longer applicable. We are certain, however, that Arlington I-66 has not yet reached that point: P. S. & E. approval has not been given, construction contracts have not been awarded, and actual construction on the highway itself has not begun.

 Appellees claim that the district court correctly held that Section 102(C) is not applicable to Arlington I-66 because design approval for this project was obtained on January 21, 1971. Section 5 of the Federal Highway Administration Instructional Memorandum of November 30, 1970, states that an environmental study is not mandatory for projects obtaining design approval before February 1, 1971. We have held that Section 102(C) is applicable to a project until it has reached the state of completion where the costs of abandoning or altering the proposed route would clearly outweigh the benefits therefrom. In light of the "to the fullest extent possible" language, we have compared *all* of the steps already taken towards construction of Arlington I-66 with *all* of the steps yet to be taken and have concluded that this highway has not yet reached that stage of completion that cuts off application of Section 102(C). Manifestly the date of design approval alone does not accurately measure whether Arlington I-66 has reached the crucial stage, and determining the applicability of Section 102(C) by this standard alone would be arbitrary and capricious agency action and an abuse of administrative discretion. Administrative Procedure Act, 5 U.S.C.A. § 706(2) (A).

 The district court suggested and appellees assert that Section 102(C) is not applicable to highways. We disagree. In the introduction to this section Congress demands that "public laws of the United States shall be interpreted and administered in accordance with the policies set forth" and that "all agencies of the Federal Government" shall comply with the requirements of the statute. Without a doubt the Department of Transportation was intended to be included within this sweeping language. See Named Individual Members of the San Antonio Conservation Society, *supra* 446 F.2d at 1024. We read the cases relied upon by the district court and discussed above to mean that the refusals to apply the National Environmental Policy Act were occasioned not by a "highway" label but because construction had reached an advanced stage of completion. *Pennsylvania Environmental Council, Inc., supra; Elliot, supra; Brooks, supra.*

 Finally, the district court held and appellees claim that the question whether Section 102(C) must be complied with is moot because the Secretary has agreed voluntarily to file an environmental impact statement. We disagree. Filing a report without suspension of work on Arlington I-66 until the report has been considered by the Secretary is not the sort of compliance that is likely to change the result. Section 102(C) contemplates not only that a report be compiled but also that the Secretary take into account the information contained therein in determining the final location and design of a highway.

This statute does not limit the authority of any governmental agency in any permanent or conclusive manner. It does, however, contain a mandate that action can be taken only following complete awareness on the part of the actor of the environmental consequences of his action and following his having taken the steps required by the Act.

National Helium Corporation v. Morton, 455 F.2d 650 (10th Cir. 1971). We are led to this conclusion by language in Section 102(C)—*e. g.*, "proposed action," "should the proposal be implemented," "alternatives to the proposed action"— and the congressional intention to actually affect and preserve the environment, expressed in the declaration of policy in the Act (42 U.S.C.A. § 4331):

(a) The Congress, recognizing the profound impact of man's activity on

the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

When the Secretary decides whether the proposed route for Arlington I–66 should be altered or abandoned because of information contained in the environmental report, he may, of course, take into account previous investment in the proposed route. Morningside-Lenox Park Association, *supra*, 334 F.Supp. at 145. Further investment of time, effort, or money in the proposed route would make alteration or abandonment of the route increasingly less wise and, therefore, increasingly unlikely. If investment in the proposed route were to continue prior to and during the Secretary's consideration of the environmental report, the options open to the Secretary would diminish, and at some point his consideration would become a meaningless formality.

Given the purpose of NEPA to insure that actions by federal agencies be taken with due consideration of environmental effects and with a minimum of such adverse effects, it is especially important with regard to federal-aid highway projects that the § 102(2)(C) statement be prepared early. If defendants' contention were accepted—that no environmental impact statement is required until the final approval stage—then it could well be too late to adjust the formulated plans so as to minimize adverse environmental effects.

Once the highway-planning process has reached these latter stages, flexibility in selecting alternative plans has

to a large extent been lost. To paraphrase the District of Columbia Circuit, "In the language of NEPA, there is likely to be an 'irreversible and irretrievable commitment of resources,' which will inevitably restrict the [highway officials'] options. Either the [highway planners] will have to undergo a major expense in making alterations in a completed [plan] or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass." [Calvert Cliffs' Coordinating Committee, *supra*, 449 F.2d at 1128.]

Lathan v. Volpe, 455 F.2d 1111, 1121 (9th Cir. 1971).

We hold that appellants are entitled to an injunction against any and all further work on Arlington I–66 pending preparation and consideration of the environmental report.

IV. SECTION 138 OF THE FEDERAL-AID HIGHWAY ACT OF 1968 AND SECTION 4(f) OF THE DEPARTMENT OF TRANSPORTATION ACT OF 1966.

▆▆▆▆ We conclude that before further steps are taken towards the actual use of Spout Run Parkway and Bon Air Park for the route of Arlington I–66, federal appellees must ascertain that there is "no feasible and prudent alternative" to the use of these parklands and that the project includes "all possible planning to minimize harm" to the parklands, in accordance with Section 138 of the Federal-Aid Highway Act of 1968 (23 U.S.C.A. § 138), and Section 4(f) of the Department of Transportation Act of 1966 (49 U.S.C.A. § 1653(f)). The language of these sections is virtually identical and reads (49 U.S.C.A. § 1653 (f)) as follows:

(f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

It is undisputed that Sections 138 and 4(f) have not been complied with. Appellees claim, however, that these sections are not applicable to the use of Bon Air and Spout Run parks because these parks are part of a project "approved" before August 23, 1968, the effective date of the Acts.[3] Even if date of approval were the criterion for the applicability of these sections to project ongoing at the effective date of the Acts, these sections would be applicable to Arlington I–66 because the Secretary's "approval" is necessary at several remaining stages of this project: the Secretary must "approve" the surveys, plans, spec-

---

3. Bon Air Park is located in the I–66–1 (43)73 project segment; authorization for the acquisition of this segment occurred on June 28, 1962, and the agreement for acquisition of this right-of-way was entered into on July 28, 1966. Spout Run Parkway is located in the I–66–1 (35)75 project segment; acquisition authorization occurred on March 8, 1962, and the right-of-way acquisition agreement was entered into on January 28, 1963.

ifications, and estimates for the project, 23 U.S.C.A. § 106; the Secretary must "approve" each construction contract awarded, 23 U.S.C.A. § 112(c) & (d); and construction will be "subject to the inspection and approval of the Secretary," 23 U.S.C.A. § 114. See Named Individual Members of the San Antonio Conservation Society, *supra,* 446 F.2d at 1025 n. 23, in which the court applied these sections to a highway which had been "approved" both before and after the effective date of the Acts. Date of approval, however, is not the criterion for applicability, because according to this criterion *every* project being built with federal funds would be subject to these sections since the Secretary's "approval" extends through construction. We agree with the district court that Congress did not intend that all projects ongoing at the effective date of the Acts be subject to these sections. At some stage short of completion the costs already incurred in a project could so outweigh the possible benefits of altering or abandoning the proposed route to avoid using parkland or to minimize harm from the use that because of the stage of progress alone "no feasible and prudent alternative to the use" would exist and "all possible planning to minimize harm" would have been done. We disagree with the district court, however, that because these sections are not applicable to some ongoing projects they are not applicable to all ongoing projects. Congress has declared through Sections 138 and 4(f) that conservation of parkland is of the utmost primary importance. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Congress has also directed in Section 102 of the National Environmental Policy Act (42 U.S.C.A. § 4332) that "to the fullest extent possible . . . public laws of the United States shall be interpreted and administered in accordance with the policies" set forth in the declaration of policy of the Act (42 U.S.C.A. § 4331), quoted above in Part III. We are compelled, therefore, to conclude that these sections are applicable to a project until it has reached that stage of progress where the costs of altering or abandoning the proposed route would *certainly* outweigh whatever benefits might accrue therefrom, and that doubts about whether this stage has been reached must be resolved in favor of applicability. Arlington I–66 has not yet reached that stage of completion. The parklands have not been acquired, P. S. & E. approval has not been given, construction contracts have not been awarded, and construction on the highway itself has not begun. The court in the *San Antonio* case emphasized the date of approval as the factor determining applicability of these sections. The holding in that case is not inconsistent with ours, however, because these sections, we think, would have been applied to the highway in that case under our standard: P. S. & E. approval had not been given for the use of the park in question, construction contracts for the portion of the highway to run through the park had not been awarded, and construction of the portion to run through the park had not begun. In Wildlife Preserves, Inc. v. Volpe, 443 F.2d 1273 (3rd Cir. 1971), the court declined to apply Sections 138 and 4(f) retroactively to a highway ongoing at the effective date of the Acts. The factor determining applicability in that case, we believe, was the stage of completion of the highway; construction contracts had been awarded and construction had begun. As suggested above in Part III, a project might be so nearly complete that applying these sections to it could be termed "retroactive" application.

 The district court adopted appellees' contention that Sections 138 and 4(f) are not applicable to the use of Bon Air Park and Spout Run Parkway because these parks have not been determined "significant" by the federal or local officials having jurisdiction thereof. Furthermore, the court viewed the willingness of both local and federal officials to use these parks for highway right-of-way as a determination that these parks are insignificant. Because

"the very existence of [these sections] indicates that protection of parkland was to be given paramount importance," Citizens to Preserve Overton Park, *supra*, 401 U.S. at 412–413, 91 S.Ct. at 821–822, we must interpret these sections to mean that land used as a public park is presumed "significant" unless explicitly determined otherwise, in a manner envisioned by these sections, by the appropriate federal or local officials. There is no such determination before us with respect to Bon Air and Spout Run parks.[4] We conclude, therefore, that these parks are "significant" and protected by Sections 138 and 4(f). In the "significance" determination envisioned by Sections 138 and 4(f), the desirability of using the particular parkland in question as a highway must be ignored and only the value of the park as a park can be considered. See Named Individual Members of the San Antonio Conservation Society, *supra*, 446 F.2d at 1026. Were this not so, land valuable to the community as a park could be used for a highway even though "feasible and prudent alternatives" existed because federal or state officials had decided that using the park for highway purposes was desirable according to criteria other than whether such alternatives existed, the *only* criterion allowed by the Acts. For this reason, the choice by federal and local officials to use Bon Air and Spout Run parks for Arlington I–66 standing alone is not a determination that these parks are not "significant" as parks.[5]

■■■ Finally appellees claim that the question whether they must comply with Sections 138 and 4(f) is moot because they have agreed to comply voluntarily. We disagree because voluntary compliance alone does not give appellants full relief. In the first place, as discussed above in Part III, suspension of work on Arlington I–66 is necessary if the Secretary's determination under Sections 138 and 4(f) is to be meaningful; continuing investment in the project at its present state of development would render alternatives to use of the parks less feasible and prudent. In the second place, the Secretary's determination with respect to Spout Run Parkway will be meaningful only if made after it is known with reasonable assurance whether the proposed I–266 and Three Sisters Bridge project will be built and, if so, where the bridge will be located. Pursuant to an order of the Circuit Court of the District of Columbia, the Secretary is now in the process of reexamining the proposed location for the I–266 project. D. C. Federation of Civic Associations v. Volpe, 459 F.2d 1231 (1971). Although the district court's finding that "(t)he Three Sisters Bridge is not a part of I–66—neither is the proposed connecting road, I–266" is not clearly erroneous, it failed to consider the relationship between the projects. If the I–266 project is not built at all or if the location of the bridge is changed, it is apparent that avoiding Spout Run Parkway for the use of I–66 will be more feasible and prudent because present plans call for I–266 to connect with I–66 in this park.[6] In order to specify the appropriate time for the reconsideration

---

4. Additionally, the plan to replace Spout Run Parkway with other parkland in the same vicinity indicates to us that Spout Run is significant as a park.

5. We have been advised by counsel that subsequent to the district court's opinion, on January 8, 1972, the Arlington County Board adopted the following statement: "The Arlington County Board declares specifically that Bon Air and Spout Run parklands are of greater significance to Arlington and are more highly valued as parkland than as road right of way." Our decision with respect to ·the significance of these parklands does not depend upon this finding.

6. Appellants claim that continuing with the I–66 project in the face of the uncertain status of the Three Sisters Bridge is in itself arbitrary and capricious action on the part of the Secretary. Consideration of this claim is unnecessary because our order that the Sections 138 and 4(f) determination must be made after the Three Sisters Bridge dispute has been resolved, coupled with our injunction of further work on I–66 until the determination is made, gives appellants the same relief—injunction until the dispute is settled—that they request under this claim.

of the proposed use of Spout Run Parkway, we must first decide the threshold question of whether reconsideration is required at all.

## V. SECTION 128(a) OF THE FEDERAL-AID HIGHWAY ACT OF 1968

█ We conclude that before further steps may be taken towards the construction of Arlington I–66, the state appellees must hold a public location hearing in accordance with Section 128(a) of the Federal-Aid Highway Act of 1968 (23 U.S.C.A. § 128(a)).[7] When the 1958 public hearing on the location of Arlington I–66 was held, Section 128(a) required only that the hearing seek information to aid in the consideration of the *economic* effects of that location. In 1968 this section was amended and additional information must now be sought:

(a) Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community. . . .

█ We think that the requirements added to Section 128(a) apply to a highway ongoing at the effective date of the amendment if the costs of altering or abandoning the proposed location would not certainly outweigh whatever benefits might be derived therefrom. Our conclusion is compelled by the congressional directive in Section 102 of the National Environmental Act (42 U.S. C.A. § 4332) that "to the fullest extent possible . . . public laws of the United States shall be interpreted and administered in accordance with the policies" set forth in the declaration of policy of the Act (42 U.S.C.A. § 4331), quoted in Part III above. As we have concluded in Parts III and IV above, Arlington I–66 has not yet reached the critical stage of completion. It is distinguishable, therefore, from those highways actually under construction to which Section 128(a) as amended was held inapplicable. *Wildlife Preserves, Inc., supra; Elliot, supra.* Our case is distinguishable also from Triangle Improvement Council v. Ritchie, 314 F. Supp. 20 (S.D.W.Va.1969), aff'd 429 F. 2d 423 (4th Cir. 1970) (per curiam decision), cert. dismissed, 402 U.S. 497, 91 S.Ct. 1650, 29 L.Ed.2d 61 (1971), in which the effect of the National Environmental Policy Act upon the hearing requirement of Section 128(a) was not considered.

█ Furthermore, we think that the new hearing on the location of Arlington I–66 must not only seek information about the social effects of the proposed location, its impact on the environment, and its consistency with the community's urban planning goals, but also must seek information about the economic effects of the location in light of the proposed rapid rail service to the Rosslyn area. One line of the proposed Washington Metro will run along the same route as Arlington I–66 to Rosslyn. At the time of the 1958 hearing, this development was not anticipated.[8] From today's

---

7. We agree with the district court that Arlington I–66 is excluded from the hearing requirements of the Federal Highway Administration's Policy and Procedure Memorandum 20–8, 23 C.F.R. Part 1, Appendix A. Section 6(d), which contains the guidelines for projects on which a hearing has been held before January 14, 1969, applies only to projects which have not received location approval.

8. Although rapid rail service in the Washington metropolitan area was being planned in 1958, a line in the general area of Arlington I–66 was not planned. *See* National Capital Planning Commission, Transportation Plan for the National Capital Region (1959).

vantage point, the economic effects of Arlington I–66 might be significantly different than projected in 1958—rapid rail service might better satisfy the needs of this area than would I–66. Moreover, Arlington I–66 has not yet reached the stage of completion where alternation or abandonment of the proposed route is impossible. We are certain that Congress intended that if there is a reasonable possibility that a mistake has been made in the planning of a project as expensive, disruptive, and permanent as a highway, and if that project can still be altered or abandoned, the project must be held in abeyance pending determination of whether a mistake has in fact been made. We cannot accept the district court's decision that a new hearing on the economic effects of Arlington I–66 is unnecessary because "the transportation needs of the area have been monitored over the years by the many agencies responsible therefor—and the officials charged by law for selecting the location for I–66 have reaffirmed their choice on numerous occasions up to the present time." Section 128(a) requires that included in the information considered in evaluating the economic effects of a highway must be information obtained at a public hearing. Study by experts is not the equivalent of a public hearing, and continuing evaluation of the economic effects of Arlington I–66 based only on such study is, therefore, not consideration within the meaning of the statute.[9]

Appellants claim also that a new public hearing must be held on the economic effects of the juncture of Arlington I–66 with Lee Highway. At the time of the 1958 hearing, the plan to divide and expand Lee Highway apparently had not been formulated and, therefore, was not considered. We agree with appellants that because a fourteen-lane highway might have significantly different economic effects than a six-to eight-lane highway in the same location, the 1958 hearing cannot be considered to have taken into account the economic effects of the highway as planned. As discussed above, since the proposed· route can still be altered or abandoned in response to information obtained from a hearing, we think that a hearing in addition to the 1958 hearing must be held on this portion of the highway. We believe, however, that the hearing held to consider the design of the portion of I–66 including Lee Highway on September 29, 1970, and continued on December 7, 8, and 9, 1970, satisfies the requirements of Section 128(a). Although Section 128(a) requires a hearing only on the "location" of a proposed highway, the regulations of the Department of Transportation require a hearing on the "design" of a highway as well. Federal Highway Administration, Policy and Procedure Memorandum 20–8, § 6, 23 C.F.R., Part 1, Appendix A. This, we think, is recognition by the Secretary that the effects of a highway's location depend not only on the corridor of a highway but also on what type of highway will occupy the corridor. Since the economic effects of the Lee Highway section of Arlington I–66 might be substantially different than expected in 1958 because of the design of this portion, a hearing

9. Appellants cite also the facts that the number of jobs available in the Virginia suburbs has increased more rapidly than the number available in the District, that businesses have located in substantial numbers in Arlington County, and that several post-1958 changes have occurred in the Washington highway system, as evidence that the economic effects of Arlington I–66, would be different than expected in 1958. We disagree. The change in job distribution was projected in 1958; it has merely occurred more quickly than expected. If anything, the accelerated rate supports keeping I–66 in its present location. The location of businesses along the proposed route is such a natural direct result of constructing a highway that we think it can be said that it was anticipated and, therefore, considered in 1958. Finally, we think that changes in the highway system within the city of Washington were not so unforeseeable as to require a new hearing.

on the design alone of this portion is sufficient.[10]

Section 128(a) contemplates that information gathered from a public hearing be "considered' by the state highway department in fixing the location of a highway. As discussed above, reconsideration of the location of Arlington I–66 will be meaningful only if further expenditure of time and effort in the present route is suspended. Therefore, the progress of the present route must be enjoined pending certification by the state highway department to the Secretary that a new public hearing has been held (or that the opportunity for such a hearing has been afforded) to obtain the information required by the 1968 amendments and that the reconsideration of this information and the information obtained at the design hearing on the Lee Highway portion of Arlington I–66 has been accomplished.

## VI. RELIEF

In summary, we hold that further acquisition of right-of-way and construction of Arlington I–66 must be enjoined until federal appellees have

(1) filed and considered an environmental impact statement, in accordance with Section 102(C) of the National Environmental Policy Act, and,

(2) ascertained that there is "no feasible and prudent alternative" to the use of Bon Air Park and Spout Run Parkway (the determination with respect to Spout Run Parkway to be made after the resolution of the Three Sisters Bridge controversy) and that the project includes "all possible planning to minimize harm" to these parklands, in accordance with Section 138 of the Federal-Aid Highway Act

and Section 4(f) of the Department of Transportation Act,

and until state appellees have certified to the Secretary that a new public hearing has been held (or that opportunity for such hearing has been afforded)

(1) to obtain information about the social effects of the proposed location, its impact on the environment, and its consistency with the community's urban planning goals, and

(2) to obtain information about the economic effects of the proposed location in light of the planned rapid transit service to Rosslyn,

and that the information obtained from this hearing and the hearing upon the design of the Lee Highway portion of Arlington I–66 have been considered, in accordance with Section 128(a) as amended of the Federal-Aid Highway Act.

On remand the district court will enter an appropriate judgment granting injunctive and such other relief as may be necessary.

Reversed and remanded.

## ORDER

On petition to rehear we modify our prior opinion to delete 1339 the requirement that federal appellees shall not proceed until after Three Sisters Bridge is finally located or finally abandoned.

Whether Three Sisters Bridge will be built and where it will be located are factors that cannot be ignored in deciding what to do about I–66 and I–266. But our judgment shall not be construed to prevent simultaneous consideration of all three inter-related projects and their probable impact on each other.

10. Appellants also claimed below that the 1958 proceedings violated Section 128(b) of the Act because a tape recording of the 1958 hearing rather than a written record was submitted to the Secretary. Subsequent to the 1958 hearing, the Department adopted regulations permitting only written records of the Section 128(a) hearing. Federal Highway Administration, Policy and Procedure Memorandum 20–8, § 8(c) (1), 23 C.F.R., Part 1, Appendix A. We agree with the district court that a tape recording is the functional equivalent of a written transcript and that even were it not, the Secretary's regulations should not be given retroactive effect.