# Applicability of the Uniform Relocation Assistance Act to the Community Development Block Grant Program

The Uniform Relocation Assistance and Real Property Acquisition Act (URA), which authorizes compensation for persons displaced by federally funded urban redevelopment, applies to the projects funded out of the Community Development Block Grant (CDBG) program, as amended by the Omnibus Budget Reconciliation Act of 1981.

The statutory language and legislative history of the Housing and Community Development Act of 1974 indicate that Congress intended the URA to apply to grants made under authority of that law, including grants under the CDBG program. Administrative practice and legislative consideration of the CDBG program since 1974 reflect that intention. The amendments made to the CDBG program by the Omnibus Budget Reconciliation Act of 1981 simplified the CDBG program and reduced the level of federal involvement; however, these amendments make no explicit reference to the URA and are not inconsistent with continued application of the URA. Therefore, they cannot be said to affect the continuing applicability of the URA to community development block grants.

November 5, 1982

MEMORANDUM OPINION FOR THE GENERAL COUNSEL,
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,
AND FOR THE COUNSEL TO THE DIRECTOR,
OFFICE OF MANAGEMENT AND BUDGET

## I. Introduction

This memorandum responds to your request for our opinion concerning the applicability of the Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA), 42 U.S.C. §§ 4601–4655, to the Community Development Block Grant (CDBG) program, as recently amended by the Omnibus Budget Reconciliation Act of 1981 (Reconciliation Act). Pub. L. No. 97–35, 95 Stat. 357. The CDBG program was originally established by the Housing and Community Development Act of 1974 (HCDA). Pub. L. No. 93–383, 88 Stat. 633.

A similar issue was raised by a request submitted to this Office last year concerning the applicability of four cross-cutting civil rights statutes to the education and social services block grants created by the Reconciliation Act. In response to that earlier request, we determined that the specified cross-cutting statutes did apply to the education and social services block grants. Memoran-

dum for Michael Horowitz, Counsel to the Director, Office of Management and Budget, "Applicability of Certain Cross-Cutting Statutes to Block Grants Under the Omnibus Budget Reconciliation Act of 1981," January 18, 1982 (OLC Memorandum of January 18, 1982).* Although your recent request concerns a different cross-cutting statute and a different block grant program, several of the issues and principles discussed in the OLC Memorandum of January 18, 1982, are relevant to the question posed by your current request. We have therefore referred to its conclusions where appropriate.

In responding to your request, we have reviewed the relevant statutes, their legislative history, cases involving the URA and the HCDA, and related secondary sources. In brief, we have concluded (1) that Congress intended the URA to apply to the original CDBG program established in 1974, and (2) that Congress did not intend to alter this result when it amended the CDBG program in the Reconciliation Act.

These conclusions are set forth below as follows. In Section II, we discuss the statutory background of the URA and the original HCDA and describe the relevant provisions of each statute. In Section III, we consider the applicability of the URA to the original HCDA by reviewing the language and policy of the URA, the language and legislative history of the HCDA, HUD's prior interpretations of the applicability of the URA to the HCDA, relevant case law concerning this issue, and finally, legislative action between the original adoption of the HCDA and the adoption of the Reconciliation Act. In Section IV, we describe the specific changes made to the HCDA by the Reconciliation Act. Finally, in Section V, we discuss the applicability of the URA to the amended CDBG program.

## II. Statutory Background: The URA and the HCDA

### A. The URA

The URA was adopted in 1970 in order to establish a uniform program of relocation assistance for those displaced by federal and federally assisted projects. In the words of Section 201, 42 U.S.C. § 4621, the purpose of the URA was

> to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole.

Congress specifically linked the need for a uniform relocation assistance policy to the increasing involvement of the federal government in urban redevelopment.[1] The House Report stated:

---

* NOTE: The January 18, 1982, memorandum is reprinted in this volume at p. 83, *supra*. Ed

[1] This point is further highlighted by the fact that the provisions of the URA were taken in substantial part from the relocation assistance provisions of the Housing and Urban Development Act. S Rep No. 488, 91st Cong , 1st Sess. 2 (1969).

As the thrust of Federal and federally assisted programs have [sic] shifted from rural to urban situations, it became increasingly apparent that the application of traditional concepts of valuation and eminent domain resulted in inequitable treatment for large numbers of people displaced by public action. When applied to densely populated urban areas, with already limited housing, the result can be catastrophic for those whose homes or businesses must give way to public needs. The result far too often has been that a few citizens have been called upon to bear the burden of meeting public needs.

H.R. Rep. No. 1656, 91st Cong., 2d Sess. 2 (1970). Thus, Congress concluded that, particularly in the context of urban land acquisition, basic principles of fairness and equitable treatment required compensation to displaced persons beyond that which was constitutionally mandated.

A second major concern of Congress was that the basic right to receive adequate compensation when displaced by a federal or federally assisted program should be uniformly applied with respect to all such programs. Prior to the URA, various relocation assistance provisions were scattered throughout a number of federal statutes, and benefits to displaced individuals and businesses varied widely. For example, a person displaced by a federally assisted project in one state might have received extensive relocation assistance, while a person displaced by a similar project in another state might have received no assistance at all. The URA was designed to remedy this inequitable treatment by applying one set of compensation standards to all federally assisted projects. H.R. Rep. No. 1656, 91st Cong., 2d Sess. 2–3 (1970), Code Cong. & Admin. News 5850, 5851–52. *See* Note, *Relocation—The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970—An Empirical Study,* 26 Mercer L. Rev. 1329, 1341–42 (1975).

Finally, with respect to the general policy of the URA, it is important to note that relocation assistance was intended to compensate equitably not just individuals, but businesses as well. The definitions of "person" and "displaced person" (for whom relocation benefits must be provided) were drafted specifically to include partnerships, corporations, and associations, in addition to individuals. 42 U.S.C. §§ 4601(5) & 4601(6). In addition, the URA contains specific provisions relating to the manner in which businesses will be compensated when they are required to move as a result of federally assisted programs. 42 U.S.C. §§ 4622(a) & 4622(c). Thus, the URA is not a welfare measure, but rather a method of fairly compensating both individuals and businesses for the special burdens they may have to bear in connection with the acquisition of property for federal or federally assisted programs.

The URA imposes several specific requirements in order to fulfill this purpose. First, the Act requires certain payments to displaced individuals and businesses in order to compensate them for the actual financial losses involved in moving their homes or businesses, obtaining new mortgages, or locating replacement

607

housing. 42 U.S.C. §§ 4622–4624. Second, the Act provides for certain reloca-
tion assistance advisory services to those who are displaced. 42 U.S.C.
§ 4625(a). Finally, the Act requires the responsible agency to assure that substan-
tially equivalent housing will be available within a reasonable period of time prior
to displacement. 42 U.S.C. § 4625(c).

The URA applies these requirements not only to federal agencies, but also to
state agencies that obtain federal financial assistance. Section 210 of the URA
states that unless the head of the responsible federal agency receives satisfactory
assurances from a state agency that the state will comply with the requirements
set forth above, then "the head of a Federal agency shall not approve any grant to,
or contract or agreement with, a State agency, under which Federal financial
assistance will be available to pay all or part of the cost of any program or project
which will result in the displacement of any person. . . ." 42 U.S.C. § 4630.
The term "federal financial assistance" is defined in the URA as "a grant, loan,
or contribution provided by the United States. . . ." 42 U.S.C. § 4601(4). Thus,
in order to receive federal funds for the purpose of acquiring property, a state
must certify that it will comply with the requirements of the URA.

## B. The HCDA

The HCDA was adopted in 1974 to consolidate and simplify a number of
different housing and community development programs. *See* Pub. L. No.
93–383, 88 Stat. 633 (1974). The most notable feature of the HCDA was the
creation of the Community Development Block Grant program, which trans-
formed ten existing federal categorical grants into a single block grant program
under which the federal government would allocate funds to local governments,
which would then plan and administer their own community development
programs with these federal funds.[2]

The principal purpose in adopting the block grant formula was to give the local
governments the power to determine the projects on which the federal funds they
received would be spent. As President Ford observed in signing the bill,

> In a very real sense, this bill will help to return power from the
> banks of the Potomac to people in their own communities. Deci-
> sions will be made at the local level. Action will come at the local
> level. And responsibility for results will be placed squarely where
> it belongs—at the local level.

10 Weekly Comp. Pres. Doc. 1060 (Aug. 22, 1974). *See* Fishman, *Title I of the
Housing and Community Development Act of 1974: New Federal and Local
Dynamics in Community Development*, 7 Urban Lawyer 189, 190–91 (1975).

At the same time, however, Congress rejected revenue sharing's "no strings"
approach. Congress defeated the Administration-supported revenue-sharing pro-

---

[2] For a description of the relationship and distinction between categorical grants, block grants, and revenue
sharing, see our memorandum of January 18, 1982, at 17–19

posals and instead "adopted the block grant approach primarily to insure that Federal funds would be used with a priority to eliminate slums and blight and to upgrade and make the Nation's cities more livable, attractive and viable places in which to live." S. Rep. No. 693, 93d Cong., 2d Sess. 2 (1974). Thus, although the states were given the right to select the projects on which the funds would be spent, Congress at the same time intended to ensure that all the funds would be spent to further the specified goals of the HCDA.

This balance is reflected in the procedures adopted for implementation of the new CDBG program. These procedures can generally be divided into four separate categories: (1) Application Requirements; (2) HUD Review of Applications; (3) Allocation and Distribution Procedures; and (4) Performance Review. These categories are analyzed below in some detail in order to determine the level of federal involvement mandated by the HCDA and to establish a basis for comparing the changes in federal control wrought by the Reconciliation Act amendments to the CDBG program.

## 1. Application Requirements

The HCDA required all applications for CDBG funds to contain the following four elements: (1) a summary of a three-year community development plan that identified specific needs and objectives, set forth the activities that would be undertaken to meet community development needs and objectives, and was designed to eliminate or prevent slums and to provide improved community facilities and public improvements; (2) a housing assistance plan that surveyed the condition of available housing and specified an annual goal for the number of dwelling units or persons to be assisted; (3) satisfactory assurances that the program would be conducted in conformity with certain civil rights provisions; and (4) satisfactory assurances that the applicant had provided citizens with information about the proposed plan and had given them an opportunity to participate in the development of the application. These application requirements were far more limited than those previously required under the categorical grant programs, and they were designed to simplify the "lengthy, burdensome, and generally frustrating process by which HUD approves applications for various community development grants. . . ." H.R. Rep. No. 1279, 93d Cong., 2d Sess. 6 (1974).

## 2. HUD Approval Process

Under the HCDA, HUD was required to approve an application unless: (1) the description of needs was "plainly inconsistent" with the facts and data available to HUD; or (2) the activities identified in the application were "plainly inappropriate" to the needs identified; or (3) the application did not comply with the HCDA or other applicable laws. Congress intended that the presumption would be in favor of approval of an application and that HUD's review "should be limited in its scope. . . ." S. Rep. No. 693, 93d Cong., 2d Sess. 55 (1974), H.R.

Rep. No. 1279, 93d Cong., 2d Sess. 127–28 (1974); *see* Fishman, *Title I of the Housing and Community Development Act of 1974: New Federal and Local Dynamics in Community Development,* 7 Urban Lawyer 189, 194 (1975). Congress intended to "reduce significantly the unnecessary 'second-guessing by Washington' that has been criticized under existing programs," and it expected that "the shift from project to program review will accomplish this, in large measure." S. Rep. No. 693, 93d Cong., 2d Sess. 56 (1974). This policy was underscored by the requirement that any application would be deemed approved unless HUD set forth specific reasons for disapproval within 75 days after receipt of the application.

### 3. Allocation and Distribution Procedures

The HCDA replaced the more discretionary allocation procedures contained in the previous categorical grant programs with a formula approach to be developed by HUD on the basis of several specified factors.[3] Once HUD developed this formula, the distribution procedures operated automatically.

### 4. Performance Review

The HCDA also contained specific procedures for HUD review of a grantee's performance under the CDBG program. HUD was required to make an annual review and audit of the grantee's performance in order to determine whether the grantee had carried out the program as described in its application, whether the program conformed to the requirements of the HCDA and other applicable laws, and whether the applicant maintained a continuing capacity to carry out the program. § 104(d), 88 Stat. 633 (1974). HUD was required to make appropriate adjustments in the amount of annual grants in accordance with its findings during the annual performance review. Thus, the performance review was designed to be a backup for the review of the original application.

## III. Applicability of the URA to the HCDA

### A. *Statutory Language and Policy of the URA*

By its terms, the URA seems to apply to community development block grants under the HCDA. The URA is applicable to "any grant to, or contract or agreement with, a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person. . . ." 42 U.S.C. § 4630. A CDBG award is clearly a grant to a state agency, and it is well within the definition of "federal

---

[3] "The formula amount is determined on a 4-factor basis including population, extent of poverty counted twice, and housing overcrowding." H.R Rep No. 1279, 93d Cong., 2d Sess. 131 (1974). Other than the discretion inherent in the development of the formula itself, HUD lacked discretion with respect to the distribution of the great bulk of the funds under the HCDA.

financial assistance."[4] In addition, the HCDA specifically contemplated assistance to state "programs" (such as the community development programs outlined in CDBG applications) which were likely to "result in displacement" of individuals or businesses. The CDBG program established by the HCDA seems to fall squarely within the contemplated scope of the relief provided by the URA.

Moreover, this result is consistent with the general policy of the URA. The principal policy judgment underlying the URA was the conclusion that, particularly in the context of the increasing federal subsidization of urban renewal, some form of statutorily required relocation assistance was necessary to compensate displaced individuals and businesses. Congress decided that since federal funds were being used to dislocate persons and businesses, federal funds ought to be available to pay for the full costs of each dislocation. Community development was one of the critical areas upon which Congress focused when it enacted the URA, and relocation assistance was regarded not as a welfare program, but rather as the only fair method of spreading the burden imposed by projects undertaken on behalf of the public.[5] Thus, even though the HCDA permitted the states to determine what types of projects to pursue, it did not supplant Congress' determination that federal funds should not be used to displace individuals and businesses without adequate compensation. In addition, the important goal of uniform treatment of persons displaced by federally assisted projects regardless of the project's location[6] could not accomplished if relocation assistance were merely optional under the HCDA.

## B. Statutory Language and Legislative History of the HCDA

Having determined that community development block grants under the HCDA are the type of federal assistance that the URA was intended to govern, the question remains whether there is anything in the statutory language or legislative history of the HCDA itself that is antithetical to the application of the URA. On the whole, both the statutory language and the legislative history of the HCDA suggest that Congress assumed that the URA would apply to block grants under the HCDA. The statutory language does not specifically refer to the URA, but it does require the Secretary to disapprove an application not in compliance with the requirements of "other applicable law." Thus, Congress expected that at least some laws other than the HCDA would govern block grants.

The legislative history of the HCDA suggests that Congress assumed that the URA was among the statutes that would apply to block grants. Two sections proposed as part of the Senate bill that became the HCDA were included to expand the coverage of the URA.[7] Although these provisions were not ultimately

---

[4] 42 U S C § 4601(3) defines state agency to mean, *inter alia*, "any department, agency, or instrumentality of a State or of a political subdivision of a State . . ." 42 U.S.C. § 4601(4) defines "Federal financial assistance" as "a grant, loan, or contribution provided by the United States    "

[5] In this sense, the URA is more akin to a cross-cutting civil rights statute than to a welfare statute or other federal grant program. Although it results in the payment of money, in essence it establishes certain rights to fair and equitable treatment

[6] *See supra.*

[7] These provisions are discussed in your memorandum of July 30, 1982, at pages 11–13.

adopted, they strongly suggest that at least the Senate understood that the URA would apply to the HCDA block grants.

Proposed § 309 would have provided for additional federal payments to compensate a local community development agency for required relocation payments beyond the amounts to which the local agency would otherwise have been entitled under the URA. The Senate Report explained the need for this provision as follows:

> The Committee took cognizance of the fact that the Uniform Relocation Assistance Act of 1970 requires that the Federal government no longer pay the full relocation cost after July 1, 1972. Under this act the Federal contribution for relocation assistance will be significantly reduced. Many localities have already notified members of the Congress that this change will drastically curtail their ability to carry out community development activities. The Committee, therefore, includes this provision [proposed § 309] in order to express its serious concern about the expected adverse effect of the pending relocation provisions on housing and community development programs, and records its view that Federal contributions for relocation costs associated with Federally-assisted development programs should remain at their present level.

S. Rep. No. 693, 93d Cong., 2d Sess. 51 (1974). As your memorandum of July 30, 1982, recognizes, this provision indicates that the Senate "believed the URA to be applicable to displacement resulting from acquisition for title I. . . ." *See* your memorandum of July 30, 1982, at 12.

In addition, proposed § 315 of the Senate bill was an amendment to the URA to extend its coverage of only those who were displaced by actual acquisitions of property to those who were displaced by code enforcement, rehabilitation, and demolition as a result of activity assisted under the HCDA. The Senate Report described this provision as follows:

### UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY ACQUISITION POLICIES ACT OF 1970

> Sec. 315—Would extend the definition of a person displaced as a result of the acquisition of real property to include those who are required to discontinue business or move from their dwelling as a direct result of activity assisted under this Chapter.

S. Rep. No. 693, 93d Cong., 2d Sess. 136 (1974). This provision also suggests that the Senate understood that the URA would apply to the HCDA, and by this provision it sought to extend the URA beyond those persons to which it would otherwise have been applicable. There would have been no reason to broaden the range of persons eligible for URA benefits if the Senate had concluded that the URA would not apply to the HCDA.

Although these proposed expansions of the URA were not ultimately adopted as part of the HCDA, there is no evidence that they were rejected because the Senate believed the URA would not apply. To the contrary, the inclusion of these provisions to expand the coverage of the URA in the proposed HCDA indicates that there was little question, at least in the Senate, that the URA would apply to the HCDA.[8] Thus, although the legislative history is not conclusive, it strongly suggests that Congress assumed that the URA would be applicable to community development block grants.

## C. HUD's Contemporaneous Construction of the Applicability of the URA to Block Grants

HUD's regulations implementing the URA and the HCDA are unquestionably relevant to the issue whether the URA is applicable to the HCDA. The Supreme Court has noted that "[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall* v. *Tallman,* 380 U.S. 1, 16 (1965). The Court has also stated that an agency's interpretation is particularly persuasive "when the administrative practice at stake 'involves a contemporaneous construction of a statute by men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Development Co.* v. *Electricians,* 367 U.S. 396, 408 (1961) (citation omitted). On this basis, the Court has concluded that to sustain an agency's interpretation of a statutory term, the Court "need not find [the agency's] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Compensation Commission* v. *Aragon,* 329 U.S. 143, 153 (1946). Thus, HUD's construction of the URA and the HCDA is entitled to considerable weight in determining the applicability of the URA. *See* 2A, C. Sands, Sutherland Statutory Construction, §§ 49.01–49.11 (4th ed. 1973); McMillan and Peterson, *The Permissible Scope of Hearings, Discovery, and Additional Factfinding During Judicial Review of Informal Agency Action,* 1982 Duke L. J. 333, 373–74.

Since the enactment of the HCDA, HUD has consistently construed the URA to be applicable to community development block grants. Shortly after the adoption of the HCDA, HUD adopted regulations for the implementation of that Act, which included a requirement that grantees comply with the URA. 39 Fed. Reg. 40144 (Nov. 13, 1974). Subsequently, in a revision of its regulations

---

[8] Contrary to your suggestion (*see* your memorandum of July 30, 1982, at p 13), we do not regard these provisions as being consistent with merely discretionary application of the URA; nor do we believe that their deletion suggests that Congress intended all relocation assistance to be at the choice of the grantee Similarly, we do not believe that the inclusion of relocation assistance in § 105's list of authorized uses of block grant funds means that the provision of relocation assistance is discretionary. That Congress included relocation assistance as one of the permissible uses to which block grant funds could be put does not indicate congressional intent that application of the URA be permissive rather than mandatory. *See* § 105, 88 Stat. 633 (1974). Rather, § 105 by its terms was intended simply to set forth the permissible uses of block grant funds. The section sets boundaries for local programs; it does not make otherwise-required activities merely permissive

613

concerning the URA, HUD set forth as first on a list of HUD grants to which the URA was applicable, "community development block grant[s] under title I of the Housing and Community Development Act of 1974." 40 Fed. Reg. 7602, 7604 (Feb. 20, 1975). HUD's regulations concerning the URA were subsequently revised in 1978, at which time HUD stated, "[t]he basic objectives of the proposed revision are to adopt requirements appropriate to the community development block program authorized by Title I of the Housing and Community Development Act of 1974. . . ." 43 Fed. Reg. 13836 (March 31, 1978). Thus, from the adoption of the HCDA in 1974 until the enactment of the Reconciliation Act in 1981, HUD consistently interpreted the URA to apply to community development block grants.

## D. Case Law Concerning the Applicability of the URA to the HCDA

As your memorandum points out, no cases have ever directly considered the issue whether the URA is applicable to community development block grants. Since HUD regulations have specifically provided for application of the URA to block grants, no litigation has arisen concerning that basic issue. HUD did, however, impose certain restrictions on the extent to which the URA applied to situations other than where the federal or local government acquired property as part of an urban renewal project. These restrictions prompted litigation on the scope of the URA.

For example, in *Alexander* v. *HUD*, 441 U.S. 39 (1979), the Supreme Court resolved a split in the circuits concerning whether the URA applied to individuals who were displaced when HUD foreclosed mortgages after private parties defaulted on federally guaranteed loans. In that case the Court agreed with HUD's interpretation that the URA applied only to acquisitions of property that occurred as part of a comprehensive program, and not to individual mortgage foreclosures. In other cases, the lower courts were called upon to resolve similar disputes. In *Devines* v. *Maier*, 494 F. Supp. 992 (E.D. Wis. 1980), a district court concluded that the URA did not apply to non-acquisition activity such as intensive housing code enforcement programs carried on with block grant funds. In *Young* v. *Harris*, 599 F.2d 870 (8th Cir. 1979), the Eighth Circuit decided that the URA did not apply to redevelopment projects undertaken by private developers, even if the private developers were indirectly aided by CDBG funds.

Although none of these cases dealt specifically with the question at issue here, several of the cases assume (as your memorandum recognizes) that the URA is generally applicable to community development block grants. In *Young* v. *Harris*, for example, the court stated the applicable test as follows:

> Whether the project has received federal financial assistance depends upon an evaluation of the city's use of the Community Development Block Grant funds. Since we have already concluded that the city's agreement with the developer clearly did not render the developer's project a joint undertaking, financial assist-

ance for municipal services cannot necessarily be equated with financial assistance to the private redevelopment project. This is especially true if the city was not required directly to apply or channel the Community Development Block Grant funds to the municipal services it provided in the Pershing-Waterman area. In any event, federal financial assistance to a private project is insufficient to bring the project into the realm of the URA.

599 F.2d at 878 (footnote omitted). *See also Devines* v. *Maier,* 494 F. Supp. at 996. Your memorandum also cites two unreported cases in which courts have commented (although not held) that the URA is applicable to community development block grants. *Grand Boulevard Improvement Ass'n.* v. *City of Chicago,* No. 80–C–4760, (N.D. Ill., Oct. 14, 1981); *Campbell* v. *Hills,* No. 75–1331 (W.D. Pa., Oct. 15, 1975). Thus, although no court has expressly and categorically held that the URA is applicable to community development block grants, every court that has dealt with the subject has assumed that result. We are aware of no contrary holding or even contrary *dictum*.

*E. Legislative Action After the HCDA and Prior to the Reconciliation Act*

After the enactment of the HCDA, Congress reconsidered the CDBG program several times prior to the Reconciliation Act. The HCDA was reauthorized and amended in both 1977 and 1980. Housing and Community Development Act of 1977, 91 Stat. 1111 (1977); Housing and Community Development Act of 1980, 94 Stat. 1614 (1980). At each of these times during the reauthorization and amendment of the HCDA, Congress could have altered HUD's well-known determination that the URA applied to community development block grants, but it chose not to do so.[9] When Congress reenacts a statute that has been contemporaneously interpreted by the administrative agency responsible for its enforcement, courts presumptively regard the administrative interpretation to be correct. *Snyder* v. *Harris,* 394 U.S. 332, 339 (1969). This rule is "based upon the theory that the legislature is acquainted with the contemporaneous interpretation of a statute, especially when made by an administrative body or executive officers charged with the duty of administering or enforcing the law, and therefore impliedly adopts the interpretation upon reenactment." 2A, C. Sands, Sutherland Statutory Construction, § 49.09 at 256–57 (4th ed. 1973). In this instance, the reauthorization of the HCDA in 1977 and 1980 is strong evidence that Congress intended the URA to apply to community development block grants.

Moreover, Congress passed certain amendments to the HCDA in 1978 that provide additional evidence of its intent to apply the URA to the CDBG program.

---

[9] In fact, as the House Report noted in 1977, "[w]hen the program was enacted in 1974, it was recognized that experience with the program and that further study of the mechanics of grant allocations to various recipients could lead to extensive changes in the program in the course of reauthorization." H.R Rep. No. 236, 95th Cong., 1st Sess 2 (1977). When Congress reauthorized the HCDA in 1977, the House Housing and Communities Subcommittee "undertook a thorough review of the program. . ." and ultimately made "numerous changes in the program's operations." *Id.*

Congress adopted an amendment to the HCDA designed to permit grantees to utilize block grant funds to provide relocation payments and assistance to those displaced by private developer projects.

The Senate Report described this provision as follows:

> Section 103(b) would enable localities to use community development block grant funds to provide relocation payments and assistance when the communities determine these are appropriate to the community development program. Under the existing program, only displacements caused by activities assisted under the block grant program are eligible for assistance. This provision would permit assistance where there is a displacement of tenants under private developer-Section 8 projects, or as a result of other public or private actions which cause displacement but are not presently covered by the Uniform Relocation Act.

S. Rep. No. 871, 95th Cong., 2d Sess. 12 (1978). A similar passage is set forth in the House Report, which indicates that the provision was designed to give more discretion to local communities to make relocation payments with CDBG funds, "except as may be required under the Relocation Act." H.R. Rep. No. 1161, 95th Cong., 2d Sess. 14 (1978). These statements suggest that although certain types of displacements might not have been covered by the URA, at least some aspects of the community development block grant program were covered.

This conclusion is confirmed by the Conference Report on the same provision:

> [T]he conferees understand that the Department *has narrowly interpreted the Uniform Relocation Act* to exclude displacement caused by certain public or private actions which have been undertaken with the use of Federal funds. The validity of this interpretation is currently before the courts. Both the Senate bill and the House amendment contained a provision which would enable localities to use Community Development Block Grant funds to provide relocation payments and other assistance to persons who are displaced by private or public activities, when such payments or assistance are appropriate to the locality's community development plan. The conferees wish to make clear that the enactment of that provision shall not be read as an endorsement of any interpretation of the URA; rather, the adopted provision is intended to permit CDBG funds to be used for relocation payments, whether or not the displacement is covered by the URA.

H.R. Rep. No. 1792, 95th Cong., 2d Sess. 99–100 (1978) (emphasis added).

This statement demonstrates that Congress was aware of the cases previously cited concerning the issue whether the URA was applicable to situations other than acquisitions undertaken by state or local governments as part of an urban renewal plan. The statement also shows that the Committee regarded HUD's

interpretation of the URA as a narrow one. Although the Committee purports not to pass judgment on the issue then before the courts (whether a broader interpretation was required by the URA), at the very least, the statement shows that Congress accepted HUD's interpretation that the URA applied to some aspects of the CDBG program. Thus, Congress has implicitly endorsed HUD's conclusion that the URA is applicable to the HCDA.

## F. Summary

On the basis of the foregoing evidence, we have concluded that there is little doubt that Congress intended the URA to apply to the CDBG program enacted by the HCDA. This conclusion is consistent with the statutory language and legislative history of both acts, their administrative construction, relevant court cases, and subsequent legislative action. On the basis of this conclusion, we now proceed to an analysis of the effect of the Reconciliation Act.

## IV. The Omnibus Budget Reconciliation Act of 1981

### A. Background

The Reconciliation Act was an unprecedented piece of legislation that, through the new mechanism of the budget reconciliation process, converted numerous existing federal categorical grant programs into a series of block grants to state and local governments. The general background of the block grants enacted by the Reconciliation Act is described in our memorandum of January 18, 1982, concerning the applicability of cross-cutting civil rights statutes to two of the Reconciliation Act block grants. *See* OLC Memorandum of January 18, 1982. [*See* p. 83 of this volume.] In many instances, the new block grants marked a radical departure from the existing system of federal categorical grants.[10]

The changes made by the Reconciliation Act to the CDBG program, however, were relatively limited. The community development aid program was already in the form of a block grant, and no federal categorical grants were added to the CDBG program. Instead, the program was simplified and streamlined, particularly in the application process, as described in greater detail below.

### B. Specific Changes in the CDBG Program

The Senate Report described the purpose of the Reconciliation Act amendments to the CDBG program as follows:

> Our intent is to greatly reduce burgeoning administrative hurdles forced in the path of local governments seeking "entitlement" community development grants. In so doing, it is our

---

[10] This was particularly true, for example, with respect to the education block grant discussed in our previous memorandum.

> purpose to lessen significantly this improper Federal intervention in the local decision making process.

S. Rep. No. 139, 97th Cong., 1st Sess. 226 (1981).

To a great extent, Congress seems to have viewed the Reconciliation Act amendments to the CDBG program as designed to recapture the spirit of the original HCDA. The principal criticisms of the CDBG program related not to the specific provisions of the HCDA, but rather to HUD's implementation of the statute and specifically its tendency to substitute its own judgment for that of local officials. *See* Williamson [Assistant to the President for Intergovernmental Affairs], *Community Development Block Grants*, 14 Urban Lawyer 283, 288–90 (1982). For example, the Senate Report noted with approval that the HCDA had made possible a reduction in federal regulations from 2600 pages to only 52 pages, but then commented with dismay that in the ensuing years, the number of pages of regulations had begun to "approach the 2600 replaced in 1974." The Report concluded, "[f]ederal intrusion into the local policy making machinery is real and direct. The notion of entitlement is, at best, clouded by the events of recent history." S. Rep. No. 139, 97th Cong., 1st Sess. 227 (1981). In other words, Congress objected to the recent HUD regulations, which had the effect of converting a program where states were entitled to certain funds into a program that was administered in a style appropriate to categorical grants. Thus, Congress acted to simplify the administration of the CDBG program and return the program to the more limited HUD involvement contemplated by the drafters of the HCDA.

Congress implemented this purpose by streamlining the application process. In place of the more detailed statements of needs and objectives and projected uses of block grant funds, the Reconciliation Act required only "a final statement of community development objectives and projected use of funds. . . ." Section 302(b), 95 Stat. 384, 42 U.S.C.A. § 5304(a)(1) (1982 Supp.). HUD's previous right to review the statements to determine whether they were "plainly inconsistent" or "plainly inappropriate" was eliminated because Congress found that "[t]he HUD regional and area office staff has used the application process far too frequently as a means for imposing HUD's views of acceptable program activity on local entities." S. Rep. No. 139, 97th Cong., 1st Sess. 227 (1981). In addition, the Reconciliation Act eliminated the complex citizen participation procedures of the old statute, but retained requirements for publication of the proposed community development activities and public hearings in order to assure full participation by affected citizens. *See* 42 U.S.C.A. § 5304(a)(2) (1982 Supp.); S. Rep. No. 139, 97th Cong., 1st Sess. 228 (1981).

Other application requirements remained as part of the CDBG program. Communities are still required to make a number of certifications "to the satisfaction of the Secretary," including certifications that the grantee has complied with the public notice and hearing requirements, that the grant will be conducted and administered in conformity with certain civil rights statutes, that the projected use of funds will "give maximum feasible priority to activities

which will benefit low- and moderate-income families or aid in the prevention or elimination of slums or blight," and that "the grantee will comply with the other provisions of this chapter and with other applicable laws." 42 U.S.C.A. § 5304(b)(3)–(4) (1982 Supp.). In addition, the Reconciliation Act continued to require entitlement communities to certify that they are following a HUD-approved housing assistance plan. 42 U.S.C.A. § 5304(c) (1982 Supp.).

Outside of the application process, the CDBG program remained substantially the same. The Senate Report pointed out, for example, that the allocation process for the entitlement program remained "essentially unchanged." S. Rep. No. 139, 97th Cong., 1st Sess. 241 (1981). States were, however, given the option of administering block grant distribution for non-metropolitan areas.[11] If a state declines to administer the small cities program, HUD will administer the program in accordance with the provision governing the entitlement program. 42 U.S.C.A. § 5306(a) (1982 Supp.).

The Reconciliation Act also left intact the requirement for annual performance review by HUD. HUD is authorized to make adjustments in the block grants based upon its annual performance review. See S. Rep. No. 139, 97th Cong., 1st Sess. 227 (1981). Thus, the underlying theory of the Reconciliation Act changes to the CDBG program was that HUD's review of initial applications should be replaced by the annual review of actual performance under the CDBG program.

## V. Applicability of the URA to the Amended CDBG Program

### A. Applicable Legal Standard

The ultimate legal issue addressed in this memorandum is whether the URA applies to the CDBG program as amended by the Reconciliation Act. As discussed above, it seems clear that the URA was intended to apply to the original HCDA. Therefore, the remaining question is whether, in amending the HCDA, Congress intended that the URA no longer apply to the CDBG program. As your memorandum suggests, there is no direct discussion of the URA in the Reconciliation Act. Thus, since the Reconciliation Act did not create a new statute, but simply modified the CDBG program, the question is whether there is evidence that Congress intended to alter the applicability of the URA to community development block grants, i.e., whether the Reconciliation Act impliedly repealed the URA with respect to the CDBG program.[12]

---

[11] The Reconciliation Act also shifted the balance of funding between the entitlement metropolitan communities and non-metropolitan areas from 80–20 percent to 70–30 percent. Although a number of states have chosen to take over the small cities CDBG program, several of the larger states, including California and New York, have chosen not to take over the program. Williamson, *Community Development Block Grants*, 14 Urban Lawyer 283, 296 n.82 (1982)

[12] Your memorandum suggests that "the present inquiry does not raise the issue of implied repeal, but concerns the applicability *vel non* of the URA itself." (Your memorandum of July 30, 1982 at p. 20, fn 3.) Since we have determined, however, that the URA was intended to apply to the original HCDA, the question of the effect of the Reconciliation Act necessarily involves the issue of implied repeal. It is axiomatic that new amendments and an existing statute must be read together as one statute *Kirchner v. Kansas Turnpike Authority,* 336 F 2d 222, 230 (10th Cir 1964); *see* 1A, C. Sands, Sutherland Statutory Construction, §§ 22.34–35 (4th ed. 1972) Thus, the Reconciliation Act amendments must be read as a part of the existing CDBG program, to which, as we have demonstrated, Congress clearly intended the URA to apply.

In our memorandum of January 18, 1982, we set forth the applicable legal standard for determining whether Congress has impliedly repealed an earlier law. As we stated there, repeals by implication are disfavored, and, in general, courts will require clear and convincing evidence that a later statute is impossible to reconcile with the earlier law. OLC Memorandum of January 18, 1982, at 23–28. Thus, this question must be resolved

> by first attempting to ascertain if Congress made a "clear and manifest" expression of such intention, especially whether it made an affirmative expression of such intent. If it did not do so, we must then examine whether the [statutes] are irreconcilable.

OLC Memorandum of January 18, 1982, at 28.

## B. Applicability of the URA

That the Reconciliation Act does not refer to the URA is not an indication that Congress intended it not to apply to block grants in the future. To the contrary, since Congress was unquestionably aware that URA was being applied to the CDBG program, if Congress had intended the URA not to apply, it would have explicitly stated that it wished to change current law. Regardless of the extent of the changes made in the CDBG program, the Reconciliation Act did not purport to create a new statute; it simply amended the existing CDBG program. Thus, the fact that Congress made no mention of the URA is evidence that it intended the URA to continue to apply to the CDBG program, rather than the contrary.

This conclusion is confirmed by Congress' acknowledgment that, except for the specified changes in the application process, Congress intended that its actions not change the existing law. The Senate Report stated that the amended act

> retains the thrust and purposes of the 1974 Act but eliminates the application, application review and citizen participation requirements of the current law. In all other major respects the bill retains current law or its intent.

S. Rep. No. 139, 97th Cong., 1st Sess. 237 (1981).

In addition, the specific changes made by the Reconciliation Act are not incompatible with continued application of the URA to the amended CDBG program. The principal changes made by the Reconciliation Act were designed to streamline the application process and reduce the role of HUD in evaluating and approving applications. These procedural changes to reduce initial federal review, however, do not conflict with HUD enforcement of the URA. States can continue to certify that they will comply with the requirements of the URA without imposing any additional burden upon the application process. That Congress intended to simplify the application procedures does not necessarily mean that it also intended to eliminate substantive requirements such as the URA. To the contrary, the Senate Report states, "[i]t should be emphasized that

the Committee's intent is to cause procedural simplification rather than substantive change." S. Rep. No. 139, 97th Cong., 1st Sess. 227 (1981).

Moreover, although Congress intended to reduce federal review, particularly at the time of application, substantial responsibility remains with HUD to review local CDBG programs. HUD retains the discretion to review the certifications made by the applicant under Section 5304(b),[13] and the Secretary must have approved a housing assistance plan for any entitlement area to receive a CDBG award. Finally, each recipient of CDBG funds must be reviewed annually by HUD to determine whether its use of CDBG funds is consistent with the requirements of the Act. Thus, the elimination of HUD review of an applicant's statement of needs and contemplated uses does not mean that there will ultimately be any less review by the federal government; it simply changes the timing of that review. The remaining provisions for federal review are more than adequate to ensure continued compliance with the URA.

This conclusion is reinforced by the self-enforcing nature of the URA. If local grantees do not make proper relocation payments or provide the assistance specified by the URA, affected property owners may vindicate their rights in court. *See Devines v. Maier,* 494 F. Supp. 992 (E.D. Wis. 1980). Thus, the URA could be enforced without any federal intervention at all.

Finally, continued application of the URA would not conflict with the underlying policy of the Reconciliation Act to reduce federal involvement in the selection of community development projects. The URA was not designed to tell federal grantees how to design or implement a community development plan; rather, it was intended to spread more equitably the burden imposed by whatever choices were made in the implementation of a community development plan. Moreover, the Reconciliation Act was designed to recapture the purpose and intent of the original HCDA, to which the URA was clearly intended to apply. Thus, the URA is fully consistent with the underlying policy of the Reconciliation Act to permit more local autonomy in the selection of community development programs.

*C. Arguments That the URA Should Not Apply to the Amended CDBG Program*

In your memorandum you suggest several reasons why the URA should be interpreted as not applicable to the amended CDBG program. First, you suggest that although block grant funds are clearly "federal financial assistance" within the meaning of the URA, "it is less clear whether a provision applicable to programs in which an agency must 'approve' a 'grant' to defray a cost of 'program or project,' can be considered applicable to the amended Community Development Block Grant program, in which the Secretary distributes funds on a nondiscretionary basis to states, according to a statutory formula, and in which the states then use the funds for programs or projects at their own discretion,

---

[13] As previously noted, these certifications must be made "to the satisfaction of the Secretary."

within the constraints of categories of eligible activities." *See* your memorandum of July 30, 1982, at 21.

The language of the URA, however, seems clearly to cover the type of program envisioned by the amended CDBG program. Although an application need not identify each project in detail, the grantee must describe a "program" that will utilize federal funds. As a technical matter, there is little doubt that HUD must "approve" these grants. Although HUD no longer reviews the statement of needs and projected uses at the time of application, HUD does have discretion in reviewing the acceptability of the required certifications and the Housing Assistance Plan, which must accompany applications from all entitlement areas. Moreover, HUD has the power during its performance review to adjust grants on the basis of its findings. Thus, the amounts of the subsequent grants are inevitably based upon HUD approval of the grantees' prior performance. We have found no evidence in either the statutory language or the legislative history of the URA to suggest that Congress expected that a greater degree of federal involvement would be necessary before states could be required to follow the provisions of URA in using federal funds as part of a community development program.

Finally, we note that this argument simply extends too far in that it would also apply equally well to the original HCDA. Since the URA seems clearly to apply to the original HCDA (an interpretation that not only seems apparent on the face of the statutes, but which has also been accepted by HUD, Congress, and the courts), this argument does not provide a basis for concluding that the Reconciliation Act amendments to the CDBG program were intended to foreclose application of the URA.[14]

You have also suggested that non-applicability of the URA is supported by *Goolsby* v. *Blumenthal*, 590 F.2d 1369 (5th Cir.) *(en banc), cert. denied,* 444 U.S. 970 (1979). In that case, the Fifth Circuit decided that the URA was not applicable to the Revenue Sharing Act, 31 U.S.C. §§ 1221–1265. This conclusion was based on three factors: (1) the relationship between the specific provisions of each statute; (2) the legislative history of the Revenue Sharing Act, specifically as it concerned the absence of "federal strings" attached to the receipt of revenue sharing funds; and (3) Congress' failure to overturn an earlier court decision that held the provisions of NEPA not to be applicable to the Revenue Sharing Act.

Your memorandum relies solely on the first aspect of the *Goolsby* decision, in which the court concluded that there was an insurmountable conflict between the policies of the two Acts that would have posed substantial problems if the URA had been applied to states receiving revenue sharing funds. The court reached

---

[14] One might contend that HUD's interpretation of the effect of the Reconciliation Act is entitled to great deference. Although we of course agree with this general principle, the Supreme Court has held that the degree of deference owed to an agency interpretation depends on several factors, including "its consistency with earlier and later pronouncements. . . ." *Skidmore* v. *Swift & Co.*, 323 U.S 134, 140 (1944). When an agency changes a long-held interpretation of a statute or regulation, courts need not defer to the agency's revised interpretation *Standard Oil Co.* v. *DOE*, 596 F.2d 1029 (Temp Emer. Ct App. 1978). In this instance, your proposed interpretation of the CDBG program is not consistent with previous HUD interpretations that apparently have been accepted by Congress and the courts Thus, the interpretation now tendered by HUD would not, we believe, be accorded the same level of deference by the courts as its previous interpretation.

this conclusion by determining that revenue sharing payments were automatically made upon the receipt of certain minimal assurances from the states. The court contrasted this scheme with its finding that the URA contemplated "discretionary federal approval and specific requests to fund specific projects."[15] Thus, the court concluded that it was "at a loss to understand how these two Acts can work in consort if one Act provides for automatic distribution and the other Act contemplates prior federal approval for specifically proposed projects." 590 F.2d at 1371–72.

This type of conflict does not, however, exist with respect to the URA and the amended CDBG program. First, the amended CDBG program does not on its face have the same no-strings approach as revenue sharing. As we previously noted, there is some federal discretion in the approval of grants and in the review of grantees' performance. Moreover, in contrast to the Revenue Sharing Act, the HCDA requires federal funds to be utilized for one of the specifically enumerated purposes set forth in the Act.

Second, the URA's requirement that the head of a federal agency shall not approve a grant unless he receives satisfactory assurances that the URA will be followed is not inconsistent with this CDBG mechanism. Ever since the adoption of the HCDA in 1974, HUD has been able to implement the URA by requiring satisfactory assurances in grant applications. Nothing in the changes made by the Reconciliation Act makes it any more difficult to apply the URA to CDBG grants. HUD can still require the same assurances and can monitor compliance with the URA through its performance review. If *Goolsby*'s suggestion that "the URA envisions federal control over a funded project while revenue sharing does not" (590 F.2d at 1372) is read to require federal approval of individual projects, then our conclusion is that this statement goes too far and does not accurately characterize the URA.[16] As long as a program permits the federal government to require the proper assurances and determine whether a grantee has complied with the URA's requirements, then that program is consistent with the structure of the URA.

Finally, although *Goolsby* does contain broad language concerning the scope of the URA, the *Goolsby* court's real concern seems to be suggested by its reference to the "vast administrative problems in determining when a project is funded with revenue sharing money." 590 F.2d at 1372. Since there was so little federal direction with respect to how revenue sharing funds would be spent, there would indeed have been serious problems in implementing the URA in the context of the revenue sharing program. The same problem does not exist, however, with respect to the amended CDBG program. HUD has been able to trace the use of federal funds without any significant problems, and the Reconciliation Act amendments will not impede this ability in any material way.[17]

---

[15] This finding was based on the statutory language that "[t]he head of a Federal agency shall not approve any grant . . . unless he receives satisfactory assurances from such State agency that [the URA will be followed]." 590 F.2d at 1371

[16] Under this reading, the URA would not have been applicable to the original HCDA

[17] Courts have not permitted states to avoid responsibilities imposed by cross-cutting statutes by the expedient of diverting block grant funds to other projects and replacing them with state funds. *See Ely v. Velde*, 497 F.2d 252 (4th Cir 1974) (application of NEPA and the National Historic Preservation Act to Law Enforcement Assistance Administration (LEAA) block grants).

The other two elements relied upon by the *Goolsby* court strongly suggest that the URA should continue to apply to the amended CDBG program. The second factor considered in *Goolsby* was the legislative history of the Revenue Sharing Act, which indicated that Congress had considered and rejected imposing federal strings upon revenue sharing funds other than the requirements specifically set forth in the Revenue Sharing Act. 590 F.2d at 1372–75. In the case of the amended CDBG program, however, there are no such indications in the legislative history. To the contrary, the legislative history suggests, as previously indicated, that Congress intended the URA to apply to the CDBG program.

The final factor upon which *Goolsby* relied was Congress' failure to overturn an earlier court of appeals decision which held that NEPA did not apply to the Revenue Sharing Act. *See Carolina Action* v. *Simon,* 522 F.2d 295 (4th Cir. 1975). In the present case, however, the opposite factual setting exists. HUD specifically by regulation applied the URA to the CDBG program, and Congress failed to overturn that requirement. Congress had previously recognized and discussed HUD's policies with respect to application of the URA, but it chose not to change those policies. Thus, under the *rationale* of *Goolsby,* Congress' failure to change HUD's explicit interpretation is evidence that Congress intended the URA to continue to apply to the amended CDBG program.

Moreover, in relying upon Congress' failure to overturn the prior court decision on the applicability of NEPA to revenue sharing, the *Goolsby* court concluded that, even though the URA is more specific and could apply in a situation where NEPA did not, it would be "incongruous to distinguish between the two acts." 590 F.2d at 1377. Therefore, the court ruled that the fact that NEPA did not apply to revenue sharing was evidence that the URA did not apply as well. In the case of the amended CDBG program, precisely the contrary is true. Congress has implicitly recognized that NEPA *does* apply to the HCDA and, in fact, has adopted a special provision to permit local grantees to carry out the federal government's responsibilities under NEPA.[18] Thus, under the principle of *Goolsby,* the applicability of NEPA to the CDBG program suggests that the URA should also apply.

In sum, the facts relating to the Revenue Sharing Act are sufficiently different from the amended CDBG program to distinguish *Goolsby* from the present issue. In fact, the principles established by *Goolsby* suggest a different result in this case, that the URA should continue to apply to the amended CDBG program.

The present facts seem closer to those considered by the court in *Ely* v. *Velde,* 451 F.2d 1130 (4th Cir. 1971); 497 F.2d 252 (4th Cir. 1974).[19] In that case, the

[18] Section 104(h)(1) of the HCDA states that "in lieu of the environmental protection procedures *otherwise applicable,"* HUD may require a local grantee to assume the Secretary's responsibilities under NEPA. (Emphasis added ) This language and the legislative history of the HCDA suggest that Congress assumed that NEPA would apply to the CDBG program. *See* H.R. Rep. No 1114, 93d Cong., 2d Sess. 50 (1974); 120 Cong. Rec. 28148 (1974) (Statement of Senator Jackson) Subsequent cases and scholarly commentary have also assumed that NEPA would apply to the HCDA in the absence of HUD regulations implementing § 104(h). *Ulster County Community Action Committee, Inc.* v. *Koenig,* 402 F. Supp 986, 991 (S.D.N.Y. 1975); Notis-McConarty, *Federal Accountability· Delegation of Responsibility by HUD under NEPA,* 5 Env. Aff. 121 (1976)

[19] The Fourth Circuit held, on its first hearing of *Ely* v. *Velde,* that NEPA and the National Historic Preservation Act applied to LEAA block grants. Subsequently, plaintiffs sued again after the state attempted to avoid the court's first order by shifting the federal funds to a different project. On the second hearing, the court reaffirmed its earlier decision and ruled that the state could not avoid that decision merely by shifting the federal funds to a different project.

court determined that both NEPA and the National Historic Preservation Act (NHPA) applied to block grants distributed by the Law Enforcement Assistance Administration (LEAA). The court noted that "[a] block grant is not the same as unencumbered revenue sharing, for the grant comes with strings attached." 497 F.2d at 256. Since the block grant was not for general purposes, but for the specific purposes described in the statute, the court held that the state was not entitled to use the money without observing the requirements of NEPA and NHPA.

The amended CDBG program is closer to the LEAA block grant of the *Ely* case than it is to the revenue sharing provisions at issue in *Goolsby*. Although the amended program simplifies the application process and permits states more discretion in determining the type of community development projects on which CDBG funds will be expended, the grants do not come without federal strings. HUD still must review certain aspects of the application prior to the approval of a grant, and HUD's performance review is designed to determine whether the program has been carried out in a manner consistent with the provisions of the HCDA. *Ely* thus confirms that the URA should continue to apply to the amended CDBG program.

## VI. Conclusion

In summary, we have concluded that there is little question that the URA was intended to apply to the original block grant program established by the Housing and Community Development Act of 1974. Congress was undoubtedly aware that HUD by regulation determined that the URA applied to the block grant program and implicitly approved of this result. The Reconciliation Act amendments to the CDBG program do not make any explicit reference to the application of the URA. Although they simplify the application process and diminish the amount of federal involvement at the initial application stage, the amendments are not inconsistent with continued application of the URA. In the absence of a more explicit statement that Congress intended to change the established practice of applying the URA to the CDBG program, we conclude that the URA remains applicable to community development block grants.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

625