Hiram B. **ELY**, et al., Appellants,

v.

Richard W. **VELDE**, etc., et al., Appellees.

No. 73–1889.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1974.

Decided May 8, 1974.

Emanuel Emroch, Richmond, Va. (J. Durwood Felton, III, Richmond, Va., Stewart T. Graham, Jr., Charlottesville, Va., and Emanuel Emroch & Associates, Richmond, Va., on brief), for appellants.

Vann H. Lefcoe, Asst. Atty. Gen. (Andrew P. Miller, Atty. Gen. of Virginia, on brief), for appellees.

Before WINTER, BUTZNER and RUSSELL, Circuit Judges.

BUTZNER, Circuit Judge:

Residents of the Green Springs section of Louisa County, Virginia, appeal from a denial of their application for an injunction to restrain the construction of a penal reception and medical center in their neighborhood until the requirements of the National Environmental Policy Act (NEPA) and the National

Historic Preservation Act (NHPA) have been met.[1] The district court—ruling that the state had permissibly transferred federal funds from the penal center to other state projects, and finding no significant federal contact with the center—dismissed the complaint. While we conclude that the facts do not establish that the center has become an irrevocably federal project, we nevertheless hold that if it is to be constructed without compliance with federal environmental Acts, the state must reimburse the federal government for sums initially allocated to the center, but subsequently diverted to other state projects. We therefore reverse the judgment of dismissal, reinstate the complaint, and remand the case for further proceedings.

## I

The factual background pertinent to this appeal is largely undisputed. In *Ely I*[2] we ruled that the proposed federal contribution to the center's financing was subject to NHPA and that it constituted a major federal action within the meaning of NEPA. We also concluded that the unfettered nature of block grants apportioned to the states by the Law Enforcement Assistance Administration (LEAA) under the Omnibus Crime Control and Safe Streets Act did not exempt federal participation from the requirements of either NEPA or NHPA.[3] Consequently, we held that

LEAA could not approve a grant of federal money for construction of the center until it complied with both environmental Acts.

At that time, the state had not expended any federal funds on the center or drawn on the LEAA grant. Recognizing that nothing had been done to irretrievably characterize the center itself as a federal project, we declined in *Ely I* to enjoin the state defendants from proceeding with construction.[4] Thus at the end of 1971, the state was free to relinquish its unexpended grant and begin construction on its own.

The state, however, did not undertake the project independently. It elected to rely in part on federal financing. Early in 1972, the state legislature reappropriated unspent funds and appropriated new funds for constructing and equipping the center. The Appropriations Act reflected that the state expected to use "special revenues received from the Federal government" aggregating approximately $1,000,000 in addition to state funds.[5] The source of the federal revenue was the LEAA grant which federal officials had approved after the state had submitted comprehensive plans that included construction of the center at Green Springs.[6]

In the meantime state penal officials cooperated with the LEAA to draft an environmental impact statement that would meet the requirements of NEPA.

1. NEPA, 42 U.S.C. § 4321 *et seq.* (1970); NHPA, 16 U.S.C. § 470 *et seq.* (1970).

2. Ely v. Velde, 451 F.2d 1130 (4th Cir. 1971) (*Ely I*).

3. A description of LEAA block grants and application of the Omnibus Crime Control and Safe Streets Act of 1968 [42 U.S.C. § 3701 *et seq.* (1970)] to this case is set forth in *Ely I*.

4. We emphasized this point in Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329 n. 1 (4th Cir.), cert. denied *sub nom.*, Fugate v. Arlington Coalition on Transportation, 409 U.S. 1000, 93 S.Ct. 312, 34 L. Ed.2d 261 (1972), where we noted that "the problem of the effect of the state's action on federal law was not before the court" in *Ely I*.

5. Appropriations Act of the General Assembly of Virginia, Ch. 804, § 28 [1972], Va. Acts 1252:
"Item 71. Plans and programs, special revenues received from the Federal government. . . .
Out of this appropriation $300,000 in addition to the previous allocation of $775,000, shall be allocated to the State Board of Welfare and Institutions for the construction of a Classification Center and Hospital (first phase of the projected plan for a new State Penitentiary.)"

6. In its comprehensive plans and supplements the state described the purpose and function of the facility, its location, and the area of the tract on which it would be located.

In July 1972, LEAA completed the statement and released it for circulation. Reaction of both federal and state agencies was adverse.[7] Faced with the delay that the unfavorable reception of the environmental impact statement foretold, the state penal officials decided to request withdrawal of the federal grant. They believed that by using only state funds they could let bids at a moment's notice unencumbered by the necessity of awaiting the satisfactory completion of the Acts' requirements. At the same time, they were determined to retain the federal funds and reallocate them to other projects.[8] In due course, the state notified the LEAA of its change in plans, and without objection by that agency, the federal funds originally approved for the center were reallocated to other programs in the penal system, including substantial expenditures for a jail in Norfolk, Virginia.

## II

A Fifth Circuit case appears to be the only reported instance of attempted avoidance of NEPA by the transfer of federal funds.[9] There the state, unable to comply with NEPA throughout the length of a highway in San Antonio, Texas, proposed to construct end segments with state and federal funds and the middle segment with state funds. Under the state plan, in which federal authorities acquiesced, the federal funds for the middle segment would be used for other highway construction. Rejecting the state's proposal, the court pointed out that acceptance would "be giving approval to the circumvention of an Act of Congress." The court continued, "[t]he supremacy of federal law has been recognized as a fundamental principle of our Government since the birth of the Republic. United States Constitution, Art. VI, cl. 2. The State may not subvert that principle by a mere change in bookkeeping or by shifting funds from one project to another." [10]

■■ While the facts in *San Antonio* differ from those in the case before us, the principles it expressed furnish sound precedent for our decision. Here,

7. The Department of the Interior wrote: "We find a number of procedural and substantive shortcomings in the draft environmental impact statement," and reached the conclusion that federal assistance, including LEAA funds, "which would facilitate an intrusion upon the Green Springs historic area would be inconsistent with the national policy of preserving the Nation's historic and cultural heritage." Letter from Deputy Assistant Secretary of the Interior to the Assistant Administrator, Office of the General Counsel, LEAA, September 21, 1972.

The Environmental Protection Agency complained that construction of the proposed facility "will have a significant adverse environmental impact on the historic and cultural character of the community. . . ." and urged consideration of alternative sites. Letter from the Director, Office of Federal Activities, Environmental Protection Agency, to the Deputy Assistant Administrator, Office of the General Counsel, LEAA, November 2, 1972.

The comments of various state agencies were summed up by the Director of the Division of State Planning and Community Affairs in a memorandum dated September 27, 1972, to the State Secretary of Administration, as follows: "In general, the agencies feel that it would be a serious mistake to locate the facility in the Green Springs area."

8. On October 19, 1972, the Director of the Virginia Department of Welfare and Institutions wrote the Director of the Virginia Division of Justice and Crime Prevention requesting withdrawal of federal funds previously allocated to the center. In concluding his letter, he stated:

"The above does not mean that we will not use federal funds allocated for corrections' construction in other programs in the State. It is our intent that within the next couple of weeks to lay before you a plan as to the use of the funds allocated [in 1971 to the center] and that we will also include a plan for the use of FY 1972 funds which were in the plan for the Green Springs project.

"I trust this letter is sufficient for you to formally notify the Law Enforcement Assistance Administration of our request to withdraw the application." [brackets added]

9. Named Individual Members of San Antonio Conservation Society v. Texas Highway Department, 446 F.2d 1013 (5th Cir. 1971), hereinafter called *San Antonio*. See also Sierra Club v. Volpe, 351 F.Supp. 1002, 1007 (N.D.Cal.1972), which involved the waiver of federal funds for a state-federal highway project instead of the transfer of the funds.

10. *San Antonio*, 446 F.2d at 1027.

too, Acts of Congress will be subverted if the state builds the center in disregard of NEPA and NHPA while retaining the federal funds initially allocated for its construction. NEPA and NHPA cut across nearly all federal construction financing. They were designed to assure to the fullest extent possible that the expenditure of federal funds would not despoil the environment or adversely affect property which has been officially designated as historically or architecturally significant.[11] A state's avoidance of NEPA and NHPA, while retaining funds that were granted with the understanding that they would foster the Acts' objectives, frustrates Congressional intent to preserve the quality of the nation's environmental and cultural heritage.

■ We are not persuaded by the state's arguments that a lack of federal contacts or the peculiar nature of LEAA block grants frees the state to reallocate the center's federal funds to other projects. Our earlier decision, *Ely I*, established that projects funded in part by block grants were subject to the requirement of NEPA and NHPA. That case also confirmed that federal contacts were sufficient to make LEAA's participation in financing the center a major federal project. We find no occasion for relitigating these issues.

Nor do we agree that the transfer of funds to new projects, as distinguished from existing projects, purges the state's bookkeeping transaction. The selection of new projects for the center's federal funds may make it impossible, as the state asserts, to prove that the federal funds released state funds for the center. But this argument misses the mark. The significant point is that the state is retaining federal funds that it obtained for the center on the premise

that it would comply with federal environmental Acts, while at the same time it is planning to construct the center without compliance. It may well be that even if the state had never applied for funds for the center, its overall block grant would not have been diminished, because such grants are apportioned on the basis of population and the state could have proposed projects of a lower priority than the center to secure approval of equivalent funds. But this we believe is irrelevant. A block grant is not the same as unencumbered revenue sharing, for the grant comes with strings attached. The state voluntarily requested federal participation in the center and in this manner obtained construction funds conditioned upon compliance with NEPA and NHPA. The federal grant thus served national policy in two respects: it contributed to law enforcement in Virginia, and it encouraged preservation of environmental values at Green Springs. The state, we hold, is not entitled to use this money without fully observing both aspects of the national policy the grant was designed to promote. We conclude therefore that the district court erred in approving the state's decision to retain the funds, bypass NEPA and NHPA, and build the center.

### III

The center's neighbors ask us to enjoin construction until the requirements of NEPA and NHPA are met. This is the remedy that was deemed appropriate by the *San Antonio* court,[12] and the residents of the Green Springs section insist that it is the only remedy that will afford them the relief to which they are entitled. Were this a highway construction case we would not hesitate to grant an injunction.[13] But here we believe

11. 42 U.S.C. § 4332 (1970); 16 U.S.C. § 470f (1970). *See also* LEAA Implementation of NEPA, 37 Fed.Reg. 4118 (1972); Proposed Rules [28 C.F.R. Part 19], 38 Fed. Reg. 32932 (1973).

12. See n. 9 *supra*.

13. *See, e. g.*, Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir.), cert. denied *sub nom.*, Fugate v. Arlington Coalition on Transportation, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); Thompson v. Fugate, 452 F.2d 57 (4th Cir. 1971); Thompson v. Fugate, 347 F.Supp. 120 (E.D.Va.1972).

that a less drastic remedy is suitable. Unlike the segment of a highway whose location has been approved, the construction of the center does not involve an inseparable relationship with other federally financed segments. LEAA's approval of construction funds for the center involved only a single project.[14]

■ We conclude that the center had not become an irrevocably federal project at the time the state withdrew its request for funds for the following reasons: 1) construction had not then begun; 2) no part of the federal grant was ever spent on any phase of the project; 3) unlike highways, no other federal project is closely related to construction of the center, nor is its construction an indispensable part of a larger project in which the federal government is participating. While the center itself is not branded as federal, the LEAA funds allocated for its construction were impressed with a commitment to preserve the environment of Green Springs. Consequently, the state cannot retain the fruits of federal partnership in this venture by transferring the funds to other projects. We hold, therefore, that the state independently can construct the center at Green Springs by renouncing federal aid, but it cannot couple its renunciation with retention of the federal aid.

On remand the district court may choose from a wide selection of remedies. The state may wish to proceed with construction of the center, and it should be permitted to do so, provided it first reimburses the federal government for funds previously allocated to the center but subsequently diverted to other projects when it withdrew its request for federal funding. In lieu of reimbursement, the state may wish to reapply for federal aid, knowing that in this event LEAA must satisfy the requirements of NEPA and NHPA before construction may proceed. On the other hand, the state may desire to abandon its plan to use the Green Springs site for a penal facility. It should be permitted to do this without reimbursement, because abandonment will afford the residents of Green Springs relief similar to the injunction they seek, and LEAA has already acknowledged that the reallocation of the funds accords with the program it administers. The suggestion of these alternatives is not intended to preclude the district court from devising any other remedy that will promote the objectives of the Omnibus Crime Control and Safe Streets Act without thwarting the national policy declared by NEPA and NHPA. If, however, the state declines to undertake a course of action consistent with this opinion, the district court should permanently enjoin construction of a penal facility at Green Springs.

The judgment of the district court dismissing the complaint is reversed, and the case is reinstated on the docket for further proceedings consistent with this opinion.

---

14. A similar distinction between highways and airports was drawn in City of Boston v. Volpe, 464 F.2d 254, 258 (1st Cir. 1972). The same court, in another case that did not involve a highway, commented on the problem caused when a non-federal participant of a federally financed project chooses to continue without federal aid. Silva v. Romney, 473 F.2d 287, 292 n. 8 (1st Cir. 1973).