SOUTH CAROLINA WILDLIFE FEDERATION; South Carolina Coastal Conservation League; and Audubon South Carolina, Plaintiffs,

v.

SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION; Tony L. Chapman, Acting Executive Director, South Carolina Department of Transportation; Federal Highway Administration; and Robert L. Lee, Division Administrator, Federal Highway Administration, Defendants.

No. 2:06 CV 02528 DCN.

United States District Court,
D. South Carolina,
Charleston Division.

April 16, 2007.

J. Blanding Holman, IV, Chapel Hill, NC, for plaintiff.

Mitchell Myron Willoughby, Randy Lowell, Willoughby and Hoefer, Columbia, SC, Beth Drake, Asst. U.S. Atty., U.S. Attorneys Office, Columbia, SC, for defendant.

## ORDER and OPINION

NORTON, District Judge.

This matter is before the court on defendants South Carolina Department of Transportation's (SCDOT) and Tony L. Chapman's [1] motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs' suit alleges defendants failed to follow the environmental protection procedures mandated by the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, in planning for the construction of the Briggs–DeLaine–Pearson Connector, a proposed roadway running between Lone Star and Rimini, South Carolina. Defendants have moved to dismiss plaintiffs' claims against them on various grounds. For the reasons stated below, defendants' motion to dismiss is granted in part and denied in part.

---

**1.** Acting Executive Director Tony L. Chapman has been substituted for Elizabeth Mabry pursuant to Fed.R.Civ.P. 25(d)(1).

## I. BACKGROUND

This action arises from the planned construction of the Briggs–DeLaine–Pearson Connector, which would connect the towns of Rimini and Lone Star, South Carolina. The estimated total cost of the project is between $100 to $150 million, which the SCDOT asserts will be funded entirely with federal appropriations. The connector would run for almost ten miles, including a roughly three mile-long bridge through the Upper Santee Swamp. Defendants state the project is necessary to bring new economic opportunities to some of South Carolina's most impoverished citizens. According to plaintiffs, the connector will have significant negative effects on the environment surrounding the swamp, which they describe as "a central component in the largest remaining unbroken wildlife habitat in central South Carolina."

 Because NEPA figures prominently in this motion, it is useful to offer a brief explanation of the Act's requirements. NEPA requires an agency that is undertaking a "major Federal Action[ ] significantly affecting the quality of the human environment" to complete an environmental impact statement (EIS). 42 U.S.C. § 4332(2)(C). The EIS must contain a number of elements, including a statement on the action's environmental impacts and the alternatives to the proposed action. *Id.* NEPA and its EIS requirement are procedural, aimed at ensuring that agencies fully consider the environmental effects of their actions and evaluate more environmentally friendly alternatives. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). NEPA also acts to ensure "broad dissemination of relevant environmental information" to the other governmental agencies and to the public. *Id.*

The Council on Environmental Quality (CEQ) has promulgated regulations, applicable to all federal agencies, to implement NEPA and the EIS requirement. *See* 40 C.F.R. §§ 1500–1508. The EIS must contain a description of the project as well as a statement describing the need for the agency action. 40 C.F.R. § 1502.13. The agency must also include a discussion of the action's environmental impact and list those "adverse environmental affects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(i)-(ii). NEPA also requires the agency to include a "detailed statement" on the "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). That statement "is the heart of the environmental impact statement" and must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

The first step in completing the EIS requirement is to issue a draft environmental impact statement (DEIS) for public comment. 40 C.F.R. § 1503.1. Once the comments have been received, the agency must "assess and consider" the comments in developing the final environmental impact statement (FEIS). *Id.* § 1503.4(a). The FEIS is then published in the *Federal Register,* *id.* § 1506.10(b), and followed by the Record of Decision, *id.* § 1505.2.

Congress authorized the connector in 1998 and so far has appropriated at least $16 million for the project.[2] The Federal Highway Administration (FHWA) and SCDOT began the NEPA process when Congress authorized the connector. The agencies issued the DEIS in October 2001 and, according to plaintiffs, received a

---

**2.** Plaintiffs assert that Congress has appropriated $16 million, (Pl.Mem.Opp. 5), while the defendants on this motion assert Congress has appropriated approximately $26 million, (Def. Mot. Dismiss 2).

number of critical comments in response. Plaintiffs also allege other federal and state agencies submitted critical comments. Defendants issued the FEIS in December 2002, although plaintiffs assert it failed to correct the problems contained in the DEIS. Among the alleged problems in the FEIS were an impermissibly narrow purpose and need statement, a failure to adequately consider alternatives, and a failure to adequately assess the project's environmental impacts. In June 2003, FHWA issued a Record of Decision approving the FEIS. On March 17, 2006, FHWA published a notice in the *Federal Register* establishing a 180–day statute of limitations period for challenging agency decisions regarding the connector. Plaintiffs brought this suit before the statute of limitations expired.

## II. STANDARD OF REVIEW

The purpose of a Rule 12(b)(6) motion "is to test the sufficiency of the complaint," not to decide the merits of the action. *Edwards v. City of Goldsboro,* 178 F.3d 231, 243–44 (4th Cir.1999). At this stage of the litigation, a plaintiff's well pleaded allegations are taken as true, and the complaint, including all reasonable inferences, is liberally construed in the plaintiff's favor. *See McNair v. Lend Lease Trucks, Inc.,* 95 F.3d 325, 327 (4th Cir.1996). Dismissal under Rule 12(b)(6) is generally regarded as appropriate only "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Generally, the court looks only to the complaint itself to ascertain the propriety of a motion to dismiss. *See Colleton Reg'l Hosp. v. MRS Med. Review Sys., Inc.,* 866 F.Supp. 891, 893 (D.S.C.1994). A plaintiff need not plead detailed evidentiary facts, and a complaint is sufficient if it will give a defendant fair notice of what the plaintiff's claim is and

the grounds upon which it rests. *See Bolding v. Holshouser,* 575 F.2d 461, 464 (4th Cir.1978). Nonetheless, the court cannot ignore a clear failure in the pleadings to allege any facts that set forth a claim. *See Migdal v. Rowe Price–Fleming Int'l, Inc.,* 248 F.3d 321, 325 (4th Cir.2001) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## III. DISCUSSION

In support of their motion to dismiss, defendants argue: (1) that plaintiffs lack standing to assert their claims; (2) that plaintiffs' claims are not yet ripe for adjudication; (3) that the Eleventh Amendment and the doctrine of sovereign immunity bar plaintiffs' claims; (4) that NEPA does not apply to state agencies; and (5) that even assuming NEPA applies, plaintiffs lack a private right of action to enforce it against the state agency.

### A. Standing

 "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). To have standing, a plaintiff must establish three well-known elements: (1) that plaintiff has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Although plaintiffs bear the burden of proving standing

requirements to the same extent as any other element of their case, on a motion to dismiss the "general factual allegations of injury resulting from the defendant's conduct may suffice" to demonstrate standing. *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130.

### 1. Injury in Fact

■ Defendants first argue that plaintiffs have not or will not suffer an injury in fact. A plaintiff cannot show injury in fact by simply pointing to an agency's failure to follow a federal procedural statute. *See Lujan*, 504 U.S. at 572–74, 112 S.Ct. 2130; *Sierra Club v. Morton*, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Rather, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club*, 405 U.S. at 734–35, 92 S.Ct. 1361. Thus, an agency's harmless failure to follow an administrative procedure does not confer standing, nor does harm only to the environment itself. Plaintiffs must demonstrate that they would personally be injured in some individual and particularized way by the defendants' actions. *See Piney Run Pres. Ass'n v. County Comm'rs*, 268 F.3d 255, 263 (4th Cir.2001).

■ Although procedural violations and environmental harm alone are not enough for standing purposes, the injury in fact requirement is not hard for plaintiffs to meet. The injury in fact requirement includes harm to " 'aesthetic, conservational, and recreational' as well as economic values." *Sierra Club*, 405 U.S. at 738, 92 S.Ct. 1361 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)); *see Lujan*, 504 U.S. at 562–63, 112 S.Ct. 2130 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for pur-

pose of standing.") In addition to offering a cognizable interest, plaintiffs must allege a personal injury to that interest. *Sierra Club*, 405 U.S. at 734, 92 S.Ct. 1361 ("But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.") When the plaintiff is an organization, as in this case, it must allege that one or more of its members would be " 'directly' affected." *Lujan*, 504 U.S. at 563, 112 S.Ct. 2130 (quoting *Sierra Club*, 405 U.S. at 735, 92 S.Ct. 1361).

■ Plaintiffs have sufficiently alleged an injury in fact. Plaintiffs stated that construction of the connector will harm the educational, scientific, recreational, and aesthetic benefits their members enjoy when using the Upper Santee Swamp. (Comp.¶¶ 10, 14, 15.) Those are cognizable interests for standing purposes. *See Sierra Club*, 405 U.S. at 734, 92 S.Ct. 1361. Further, each plaintiff has alleged that at least one of its members currently use and enjoy the area where the connector will be constructed. (Comp.¶¶ 8, 10, 12.) Those allegations are enough to avoid the problem encountered by the plaintiffs in *Sierra Club*, where there was no allegation that any of the organization's members actually used the area that would be affected by the governmental action. *Sierra Club*, 405 U.S. at 735–36, 92 S.Ct. 1361. Plaintiffs' allegations are all that is necessary to survive a motion to dismiss, particularly given that the court must "presume[ ] the general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

### 2. Traceability and Redressability

■ Defendants argue plaintiffs' injuries are not fairly traceable to the state

defendants' actions. Traceability requires plaintiffs to show the challenged agency action "causes or contributes to the kinds of injuries alleged." *Natural Res. Def. Council v. Watkins,* 954 F.2d 974, 980 (4th Cir.1992); *see Piney Run,* 268 F.3d at 263–64. Plaintiffs do not have to prove that defendants' actions are the only cause of their injuries or that they would have undisturbed enjoyment of the environment in the absence of defendants' conduct. *Watkins,* 954 F.2d at 980. Traceability is not as rigorous as tort causation, so that in chemical contamination cases, for example, a plaintiff does not have to show to a scientific certainty that the defendant's actions caused the precise harm that plaintiff suffered. *Id.* at 980 n. 7 (citing *Pub. Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 72 (3d Cir.1990)).

■ Plaintiffs have adequately alleged that the proposed action, the connector's construction, would cause injury to their members' interest in enjoying the surrounding environment. (*See* Comp. ¶¶ 7–14.) The connector, according to plaintiffs, would result in the "destruction and fragmentation of natural habitat, traffic noise from vehicles traveling on the Connector, and degradation of water quality, as well as land use changes in the area that project proponents claim the project will induce." (Comp.¶ 9.) Plaintiffs have also alleged the connector will disrupt bird activity in the area (Comp.¶ 14) and blemish the natural landscape (Comp.¶ 10).

■ Traceability, aside from requiring some causal link between the project and the claimed injury, necessarily asks whether the plaintiff has sued the right person. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 162 (4th Cir.2000); *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663–64 (D.C.Cir.1996). A plaintiff's injuries must flow from some action taken by the defendants, and not some "absent third party." *Florida Audubon,* 94 F.3d at 663. Plaintiffs have sufficiently alleged that the state defendants' involvement in the project has contributed to their potential injuries. The complaint alleges that SCDOT has been thoroughly involved in planning for the connector, including participation in issuing the EIS and applications to other state agencies for the necessary permits.[3] (Comp.¶¶ 16, 17.) The SCDOT will also be the agency charged with receiving the federal funds and actually constructing the connector—the action that is at the root of plaintiffs' purported injuries. (*See* Def. Mem. Supp. 2.)

■ Finally, plaintiffs must show their injuries can be redressed by obtaining relief against the state agency and its executive director. The Supreme Court has stated that when Congress grants a procedural right to protect concrete interests, a litigant asserting that procedural right does not have to meet all of the "normal standards" for redressability and immediacy. *Massachusetts v. EPA,* —— U.S. ——, 126 S.Ct. 2960, 165 L.Ed.2d 949 (2006) (citing *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130). Plaintiffs only have to prove that "there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Id.*

---

**3.** Plaintiffs have also submitted the final environmental impact statement issued for the connector. The FEIS lists four SCDOT employees among the preparers, and the document is jointly signed by an FHWA engineer with an SCDOT engineer. (FEIS 6–1, cover.)

A court may rely on a public document in deciding a motion to dismiss where it "was integral to and explicitly relied on in the complaint" and where the opposing party has not challenged its authenticity. *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 618 (4th Cir.1999).

■ Defendants assert NEPA does not apply to the state, so any relief requiring compliance with NEPA cannot be aimed at them. As discussed *infra,* NEPA applies in this case to the state agency, because the SCDOT will have a significant role in curing any deficiencies in the NEPA process. Plaintiffs have also met the redressability standard as stated in *Massachusetts v. EPA* because requiring defendants to reevaluate the project's environmental impacts and reconsider more environmentally friendly alternatives could prompt them to alter or abandon the decision to build the connector.

## B. Ripeness

Defendants argue that plaintiffs' claims are premature because defendants still have to conduct a reevaluation of the FEIS. Plaintiffs argue the procedural violation has already occurred and that the mandatory reevaluation is a red herring because the applicable regulations do not require a "do-over" of the EIS, but only a review of anything that may have changed since the FEIS was issued.

■ In considering whether a dispute is ripe for review, the court must look to three factors: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented. *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

■ First, delaying judicial review would cause plaintiffs substantial hardship by forcing them into a statute of limitations Catch–22. The statute of limitations for challenging the final agency actions (i.e., the FEIS and record of decision) expired on September 13, 2006. Plaintiffs could still file suit challenging the reevaluation decision because that action would have its own statute of limitations. *See Jersey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180, 190 (4th Cir. 1999). But judicial review at that point would be limited only to the actions taken in reevaluating the FEIS. The regulations do not require defendants to develop a new environmental impact statement, but only to consider the environmental impacts caused by any changes to the project that have occurred since the FEIS was issued. 23 C.F.R. § 771.129(b); *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373–74, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *S. Trenton Residents Against 29 v. Fed. Highway Admin.,* 176 F.3d 658, 663–64 (3d Cir.1999). By delaying review, plaintiffs could only challenge the narrow set of issues presented in the supplemental EIS, leaving the adequacy completely unchallenged. Delayed review would therefore significantly limit plaintiffs' ability to seek a remedy for alleged defects in the FEIS.

■ Second, judicial intervention in this case is unlikely to "inappropriately interfere" with further administrative action. Reviewing the adequacy of the FEIS will not "hinder agency efforts to refine its policies," *Ohio Forestry,* 523 U.S. at 735, 118 S.Ct. 1665, because the primary policy-setting documents have already been produced. Judicial review also does not have any real potential to "interfere with the system that Congress specified for the agency," *id.* at 736, 118 S.Ct. 1665, in reaching these types of decisions because defendants have already decided to build the connector through the Upper Santee Swamp. Defendants' argument would carry more weight if the reevaluation were a more substantive step, but because of its narrow nature and the lack of any indication that the agencies intend to use it for a thorough evaluation of all

environmental impacts, judicial review at this point will pose little undue interference.

*Ohio Forestry* involved the Sierra Club's challenge to the Forest Service's land resource management plan for a national forest located in Ohio. *Id.* at 728–29, 118 S.Ct. 1665. The Supreme Court held the plaintiff's claims were not ripe for review. *See id.* at 733–37, 118 S.Ct. 1665. The Court reasoned the plaintiff would not suffer any real hardship from delayed judicial review because the management plan was an early, tentative administrative action. *Id.* at 733–34, 118 S.Ct. 1665. There were many steps to be taken before the agency issued logging permits, including the selection of sites, the evaluation of harvesting methods, the preparation of an EIS, and providing an opportunity for public comment. *Id.* at 734, 118 S.Ct. 1665. There were thus a number of points at which plaintiffs could seek judicial review, leading to a conclusion that there was no "strong reason why the Sierra Club had to bring its challenge now in order to get relief." *Id.* In contrast, defendants in this case have already chosen the site, millions of dollars have already been appropriated, and an FEIS and record of decision have already been completed. The only remaining step—preparation of a supplemental EIS—is relatively minor.

 Finally, the issues are adequately presented to enable to the court to conduct a thorough and adequate review of the agencies' actions. The FEIS is not some abstract, complicated plan rife with mere potentialities such that the court would have to engage in " 'abstract disagreements over administrative policies.' " *Id.* at 737, 118 S.Ct. 1665 (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).

Based on the FEIS, the court can determine whether NEPA's procedural requirements have been met and what remedial action is necessary to correct any violations. As the Supreme Court noted in *Ohio Forestry,* NEPA only "guarantees a particular procedure, not a particular result." *Id.* It is NEPA's procedural requirements that allow a plaintiff "who is injured by a failure to comply NEPA procedure [to] complain of that failure at the time the failure takes place, for the claim can never get riper." *Id.* In the instant case, any violations of the procedure have already occurred. Thus, the court can determine based on the current administrative record whether defendants have failed to follow the mandated procedures.

### C. Sovereign Immunity

Defendants argue they are immune from suit under the Eleventh Amendment. The Eleventh Amendment prohibits federal courts from exercising jurisdiction over suits asserted against a state by its own citizens or by citizens of another state.[4] U.S. Const. amend. XI; *Hans v. Louisiana,* 134 U.S. 1, 18, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Because the Eleventh Amendment applies differently depending on who is being sued, its application to each defendant is discussed separately.

### 1. South Carolina Department of Transportation

 A state agency is generally considered part of the state for purposes of the Eleventh Amendment, particularly when any monetary judgment against the agency would be paid from the state treasury. *See Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 431, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). The Fourth Circuit

---

4. The United States Supreme Court has also interpreted the Eleventh Amendment as prohibiting states from being sued in state court without their consent. *Alden v. Maine,* 527 U.S. 706, 712, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

has ruled that the South Carolina State Highway Department, which was the SCDOT's immediate predecessor,[5] was immune under the Eleventh Amendment. *Faust v. S.C. State Highway Dep't*, 721 F.2d 934 (4th Cir.1983). This court has also ruled that the SCDOT is immune under the Eleventh Amendment. *Gregory v. S.C. Dep't of Transp.*, 289 F.Supp.2d 721, 724 (D.S.C.2003), *aff'd* 114 Fed.Appx. 87 (4th Cir.2004) (unpublished).

Plaintiffs assert, *inter alia*, that *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323 (4th Cir.1972), supports keeping the SCDOT as a party to this case. *Arlington Coalition* involved a challenge to the procedures used by the United States Department of Transportation and the Virginia Department of Highways in planning to construct a new interstate in Arlington County, Virginia. *Arlington Coalition*, 458 F.2d at 1326–27. The plaintiffs named the Commissioner of the Virginia Highway Department as a defendant, but not the state agency itself. *See id.* at 1329. The Commissioner argued the court lacked jurisdiction over him because his agency could independently conduct its activities, such as obtaining right-of-way easements, under state law and did not necessarily require federal participation. *Id.* The Fourth Circuit rejected the Commissioner's argument, reasoning that the state agency's activities were not "independent," particularly because they were funded with federal monies. *Id.* Joining the Commissioner was necessary, the court said, because allowing the state to move forward to would make a "sham" of any reconsideration required by the federal government. *Id.*

▮▮▮▮▮ *Arlington Coalition* does not apply to abrogate the SCDOT's sovereign immunity. That case did not involve a state agency, but simply a state officer being sued in his official capacity. As discussed below, the Eleventh Amendment provides substantially less protection to individuals than to state agencies because of *Ex parte Young*. Absent some types of congressional action, *see City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the sovereign immunity conferred by the Eleventh Amendment cannot be abrogated, regardless of how necessary a party's joinder may be to resolution of the case. Even the necessity of joining the SCDOT here is questionable, particularly since the *Arlington Coalition* court was satisfied that joining the head of the state agency was enough to prevent the procedural process from being undermined. As a result, the SCDOT is entitled to sovereign immunity.

## 2. SCDOT's Executive Director

▮▮▮▮▮ The court has jurisdiction over the Executive Director under the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Although the Eleventh Amendment provides sovereign immunity to a state and state agencies, a plaintiff is not prohibited from bringing suit against a state officer to enjoin violations of federal law. *Ex parte Young*, 209 U.S. at 159–60, 28 S.Ct. 441. *Young* only permits suits brought against state officers for prospective injunctive relief, and prohibits suits that request retroactive relief, *Edelman v. Jordan*, 415 U.S. 651, 676, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), or monetary damages that would be paid directly out of the state treasury, *Ford Motor Co. v. Dep't of the Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed.

---

**5.** The SCDOT replaced the South Carolina Highway Department in 1993. *See* S.C.Code Ann. § 57–3–10.

389 (1945); *Sales v. Grant,* 224 F.3d 293, 297–98 (4th Cir.2000). Despite the Eleventh Amendment's restriction on awards of monetary damages, a court may nonetheless award prospective injunctive relief that may require substantial financial expenditures by a state. *Edelman,* 415 U.S. at 668, 94 S.Ct. 1347.

Defendants offer three arguments on why *Ex parte Young* does not apply to the Executive Director: (1) the state officer has not engaged in violations of federal law; (2) there is not a special relationship between the state officer and the federal statute; and (3) plaintiffs have requested more than prospective injunctive relief. (Def. Reply 8–12.)

First, defendants argue that plaintiffs cannot allege that the Executive Director has violated federal law since NEPA does not apply to the SCDOT. For the reasons discussed below, SCDOT must comply with NEPA's requirements because the project is federally funded. Therefore, if SCDOT has failed to comply with the NEPA requirements, then it and its director (as the agency's controlling officer) have violated federal law.

Second, defendants argue there is not a special relationship between the Executive Director and the federal statute that forms the basis of plaintiffs' claims. *Young* requires that the state officer being sued have "some connection with the enforcement of the act." *Young,* 209 U.S. at 157, 28 S.Ct. 441. Whether the duty to enforce the act "arises out of the general law, or is specifically created by the act itself, is not material so long as it exists." *Id. Young* thus requires the plaintiff to sue the "correct" state official (i.e., the state official with control over compliance with the federal statute). When the federal law or statute does not expressly impose a duty on the state official, the court may look to the state official's duties under state law to determine whether the requisite connection exists. *See Lytle v. Griffith,* 240 F.3d 404, 409–10 (4th Cir. 2001). South Carolina law provides that the Executive Director serves as the SCDOT's administrative head and oversees its day-to-day affairs. *See* S.C.Code Ann. § 57–1–430(A). Given the Executive Director's broad duties, he is ultimately responsible for ensuring the agency complies with NEPA.

Finally, defendants argue plaintiffs have requested more than prospective relief, thereby placing their claims beyond the scope of the *Young* exception to sovereign immunity. Plaintiffs demand five types of relief: (1) a declaratory judgment that defendants have violated NEPA by preparing an inadequate EIS; (2) vacating the Record of Decision; (3) appropriate injunctive relief to ensure defendants' compliance with NEPA and prohibiting any further progress on the connector until NEPA's requirements have been met; (4) an award of attorney's fees and costs; and (5) other relief as the Court deems just and proper. (Comp. at 24.).

The Supreme Court has held that requesting a declaratory judgment that an agency violated federal law, despite dealing with past agency actions, is not barred by the Eleventh Amendment because that type of relief does not affect the agency's "past financial liability." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 646, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). Similarly, plaintiffs' requested declaratory relief here would have no effect on the agency's past financial liability. As for plaintiff's request for an injunction ensuring compliance with NEPA, the definition of prospective relief is that it compels compliance in the future. *Edelman,* 415 U.S. at 664–66, 94 S.Ct. 1347. Any injunction issued to ensure compliance would only compel the Executive Director to take future actions to follow NEPA's

requirements. An injunction prohibiting further progress on the connector until the Executive Director complies with NEPA is also prospective in nature because it applies to restrict the Executive Director's future actions. Vacating the record of decision would act prospectively as well by requiring the state and federal agencies to act prospectively to discard the old record and develop a new one. Finally, the Supreme Court has held that an award of attorney's fees and costs is not barred by the Eleventh Amendment—even if paid out of the state treasury. *See Hutto v. Finney,* 437 U.S. 678, 692–93, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

Because the Executive Director is charged with ensuring the SCDOT's compliance with NEPA and plaintiffs' requested relief consists of prospective injunctive relief and other permitted relief, *Young* operates to strip the Executive Director of sovereign immunity.

## D. NEPA's Application to State Agencies

Defendants argue that NEPA's procedural requirements do not apply to actions taken by states because NEPA, by its plain language, only applies to federal actions. *See* 42 U.S.C. § 4332 (2006). Defendants' argument, however, ignores case law holding that federal funding transforms a state project into a federal action subject to NEPA's requirements. Defendants rely on *Ely v. Velde (Ely I),* 451 F.2d 1130 (4th Cir.1971), for the proposition that NEPA does not apply to the states. (Def. Mot. at 13.) However, in *Ely v. Velde (Ely II),* 497 F.2d 252 (4th Cir.1974), the Fourth Circuit was clear in holding that NEPA applies to state agencies undertaking federally funded projects. *Ely II,* 497 F.2d at 256. The court in *Ely II* took its holding one step further to say that NEPA applies to state agencies that undertake federally funded projects even after the state legislature re-appropriates the federal discretionary funds to another project. *Id.*

Without specifically addressing the issue, the Fourth Circuit applied NEPA to state actors engaged in a federally funded highway project in *Jersey Heights Neighborhood Ass'n v. Glendening,* 174 F.3d 180 (4th Cir.1999). The Governor of Maryland, the Administrator of the Maryland State Highway Administration, and the Maryland State Highway Administration were named as defendants in that suit, along with various local planning officials. *Jersey Heights,* 174 F.3d at 180.

 In this case, defendants have conceded that "[n]o state funds are being applied to the Project" and that it will be wholly funded by the federal government. (Def. Mot. Dismiss 2.) The relevant Fourth Circuit precedent makes clear that NEPA applies to federally funded projects, even when undertaken by state agencies. If *Ely II* required the state to comply with NEPA even when discretionary funds are appropriated to other projects, then it must also require compliance in a straightforward case of a congressional appropriation that must be applied to a specific project. The connector is a federal project subject to NEPA and the Executive Director must comply with the Act's procedural requirements.

## E. Application of the Administrative Procedures Act and Enforcing NEPA Against the State

 Defendants argue plaintiffs' suit should be dismissed because the APA, which provides the private right of action for alleged NEPA violations, does not apply to state actors. NEPA does not provide a private right of action, but a private plaintiff can use the APA to bring an action for judicial review of alleged NEPA violations. *Jersey Heights,* 174 F.3d at 186. The APA provides, "A person suffer-

ing legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA defines an "agency" as "each authority of the Government of the United States, whether or not is within or subject to review by another agency." 5 U.S.C. 551(1). States and state agencies are not included in the definition of "agency," nor are they expressly mentioned in the APA.

In both *Jersey Heights* and *Ely II,* the Fourth Circuit allowed the plaintiffs to seek judicial review for a state's violation of NEPA. The court's opinion in *Jersey Heights* gives some explanation as to why it and *Ely II* permitted claims against a state despite the NEPA's lack of a private right of action. The court stated, in discussing a collateral statute of limitations issue:

> The APA by its terms applies only to "agency action," and appellants have not identified the source of their cause of action against the state defendants in this case. Nevertheless, assuming that appellants have an independent action to enforce the NEPA duties to which these non-federal entities have consented, *see Ely v. Velde [Ely II],* 497 F.2d 252 (4th Cir.1974), that action would be subject to the same time-bar as any action against the federal defendants.

*Jersey Heights,* 174 F.3d at 186 n. 1. The *Jersey Heights* court thus assumed there was a private right of action and implied that *Ely II* was the product of some sort of consent by the state. Reviewing *Ely II,* however, it is unclear what the state con-

sented to. A possible explanation is that the state defendants in *Jersey Heights* and *Ely II* failed to raise the lack of a private right of action in the course of the proceedings and implicitly consented to the suit.[6] Based on that reading, *Jersey Heights* and *Ely II* are not completely analogous to this case, where the state has raised the lack of an express private right of action. Nonetheless, those cases still demonstrate the Fourth Circuit's willingness to allow private plaintiffs to brings suits to enforce a state's NEPA responsibilities.

*Arlington Coalition* also involved private plaintiffs' suit for judicial review of the state's compliance with NEPA. Importantly for this case, *Arlington Coalition* offered its reasoning on why states should be joined in suits against federal agencies. When dealing with these types of projects, the actions taken by a state agency inevitably affects the ability to remedy NEPA violations. If the federal agency is ordered to reconsider its prior decision, the state could take steps to further the project that will make it more costly to alter or abandon that decision. *Arlington Coalition,* 458 F.2d at 1329. The state's actions would limit the advisability or pursuing alternatives, which is of concern because the very purpose of the remedy is to require the agencies to consider the alternatives which ought to have been evaluated in the first place. *Id.* The *Arlington Coalition* court was concerned that the state would increase the project's sunk-costs while the federal reconsideration was pending, thus negating the reme-

---

6. An alternative explanation of *Ely II* is that the state consented to the suit to enforce NEPA's procedural requirements by accepting federal funds. The primary issue in *Ely II* was whether receipt of federal funding requires the states to comply with NEPA. *See Ely II,* 497 F.2d at 255–56. The court's analysis could be interpreted to say that by accepting federal funding, and thereby consenting to NEPA's duties, the state also accepts that it may be subject to private suits to enforce those duties. But because the court of appeals did not expressly address the lack of a private right of action, the more reasonable interpretation is that the state simply neglected to raise it as an issue.

dy's value. *Id.* As a result, the Fourth Circuit concluded that it was necessary to join the state as a party and exercise type of "pendent jurisdiction." *Id.*

■ For the same reason, it is appropriate to allow plaintiffs to seek relief against the Executive Director. The state here could take the same steps that concerned the court of appeals in *Arlington Coalition*. Assuming defendants have violated NEPA, one of the remedies may require a new EIS that adequately evaluates the reasonable alternatives. The state could take affirmative steps towards constructing the connector that would both limit the available "reasonable" alternatives and significantly alter how the agencies evaluate those alternatives. Those activities would fall within the kind of conduct that could be addressed in an injunction if one were issued. *See National Audubon Soc'y v. Department of Navy,* 422 F.3d 174, 200–01 (4th Cir.2005). Therefore, the state—if absent from this suit—could make this court's remedy nugatory, particularly if a reconsideration of alternatives is required. Following the precedent established in *Arlington Coalition,* it is necessary for the Executive Director to be joined as a defendant.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that defendants' motion to dismiss be **GRANTED** as to the South Carolina Department of Transportation and **DENIED** as to Tony L. Chapman. It is further **ORDERED** that plaintiffs' claims against the SCDOT be **DISMISSED**.

**AND IT IS SO ORDERED.**

